### In re OXFORD HEALTH PLANS, INC., SECURITIES LITIGATION

#### No. MDL–1222.

United States District Court, S.D. New York.

July 15, 1998.

## MEMORANDUM DECISION

BRIEANT, District Judge.

Presently before the Court in these cases alleging securities fraud, which have been consolidated for pre-trial purposes, are a number of motions relating to the designa-tion of lead plaintiff and approval of lead counsel under the provisions of section 21D(a)(3)(B) of the Securities and Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA" or "the Act"), 15 U.S.C. § 78u–4. A hearing was held on June 11, 1998 and decision reserved.

On April 28, 1998 the Judicial Panel on Multidistrict Litigation filed an order consoli-dating the 52 separate actions in this litiga-tion (38 from the District of Connecticut, 9 from the Southern District of New York, 4 from the Eastern District of New York and 1 from the Eastern District of Arkansas) and transferring them to this Court for pretrial purposes pursuant to 28 U.S.C. § 1407. Two additional cases have since been filed in this District.[1] For the reasons discussed below, this Court now grants the motions of the Public Employee's Retirement Association of Colorado, the Vogel Group (as defined below) and PBHG to be appointed co-lead plaintiffs for the securities fraud cases. The Court also approves the plaintiffs' respective choices—Grant & Eisenhofer, P.A., Milberg Weiss Bershad Hynes & Lerach, L.L.P., and Chitwood & Harley—to act as co-lead coun-sel. Such counsel shall assemble and consult with an Executive Committee as set forth below.

## I. The Private Securities Litigation Re-form Act of 1995

The PSLRA, which altered the procedures for bringing class actions under the federal securities laws, was enacted in response to a variety of perceived abuses of the class action procedure. H.R.Rep. No. 104–369, at 31 (1995) *reprinted in* 1996 U.S.C.C.A.N. 730. Among other things Congress was concerned that the lead plaintiff in class action lawsuits was being determined by plaintiffs' lawyers' race to the courthouse. *See* S.Rep. No. 104–98 (1995) *reprinted in* 1996 U.S.C.C.A.N. 679. In enacting the PSLRA, Congress in-tended to "increase the likelihood that par-ties with significant holdings in issuers, whose interests are more strongly aligned

1. Of this number, 7 cases are shareholder deriva-tive actions being separately administered by this Court pursuant to the order of the panel, under Docket No. MDL 1222–D. Nothing herein per-tains to the derivative actions.

with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiffs counsel." H.R.Rep. No. 104–369, at 32 (1995) *reprinted in* 1996 U.S.C.C.A.N. at 731.

The PSLRA directs the Court to "appoint as lead plaintiff the *member or members* of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class." 15 U.S.C. § 78u–4(a)(3)(B)(i) (emphasis added). The Act creates a "rebuttable presumption . . . that the most adequate plaintiff . . . is the person or group of persons that (aa) has either filed the complaint or made a motion in response to a notice . . . (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

The presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately represent the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). Before obtaining discovery in this regard, the objecting plaintiff must demonstrate a reasonable basis for a finding "that the presumptively most adequate plaintiff is incapable of representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iv)

Finally, the PSLRA states that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v).

## II. Background

Oxford Health Plans, Inc. ("Oxford") is a Delaware corporation engaged in the managed health care business, providing health benefit plans in New York, New Jersey, Pennsylvania, Connecticut and New Hampshire. The individual defendants named in the complaints were the principal executive officers and directors of Oxford.

The securities fraud actions which have been consolidated in this Court were brought on behalf of persons and entities who purchased Oxford common stock during varying alleged class periods ranging from November 1996 through December 1997. The complaints generally claim violations of §§ 10(b) and 20(a) of the Securities and Exchange Act and Rule 10b–5 promulgated thereunder by the SEC. Specifically the plaintiffs allege that Oxford failed to disclose ongoing problems with its computer system and its resulting financial deterioration, while substantial insider trading occurred.

## III. The Movants for Appointment as Lead Counsel

Numerous motions seeking lead plaintiff status in this action have been filed, some of which were withdrawn after the cases were consolidated. The Public Employee's Retirement Association of Colorado ("ColPERA") appears to have suffered the largest financial loss, followed by the Vogel plaintiffs and the PBHG Funds. This was conceded at the June 11, 1998 hearing.

### A. ColPERA

ColPERA is a pension fund for state of Colorado employees which moved to be appointed lead counsel on December 22, 1997 alleging losses in excess of $25 million. On January 28, 1998 ColPERA moved for leave to supplement its motion revising its loss, after offsetting for certain gains, to $19,435,-749.25 (using the class period of November 11, 1996–December 12, 1997). On June 4, 1998 ColPERA submitted a proposed order appointing ColPERA as lead plaintiff, Grant & Eisenhofer, P.A. as lead counsel and an executive committee composed of Grant & Eisenhofer as Chair and four other law firms which also made lead plaintiff motions as members (Abbey, Gardy & Squiteri, L.L.P.; Wolf Popper, L.L.P.; Bernstein Litowitz Berger & Grossman, L.L.P.; and Lowey Dannenberg Bemporad & Selinger, P.C.).

### B. Vogel

On December 23, 1997 the Vogel plaintiffs ("Vogel"), consisting of approximately 35 individual plaintiffs and entities, filed a motion

for appointment as lead plaintiff and appointment of Milberg Weiss Bershad Hynes & Lerach, L.L.P., as lead counsel. On May 14, 1998 Vogel submitted a motion to supplement its original lead plaintiff motion, estimating its collective losses at $10,072,120.63 for the November 6, 1996–December 9, 1997 class period. The majority of Vogel's losses were sustained by three individuals: Daniel Hurley ($3,409,423.11); Gary Weber ($3,104,-594.57); and Michael Sabbia ($2,014,520.50) (hereinafter "the Vogel Group").

## C. The PBHG Funds

The PBHG Funds, Inc. is a Maryland corporation registered under the Investment Company Act of 1940, as amended, as a diversified open-end management company. It consists of 14 series or funds including the 5 funds that purchased Oxford common stock and sustained significant losses (the PBHG Growth II Portfolio, the PBHG Large Cap Growth Portfolio, the PBHG Select 20 Portfolio, the PBHG Large Cap Growth Fund and the PBHG Large Cap 20 Fund). The five funds which sustained the losses (hereinafter "PBHG") moved on December 30, 1997 to be appointed lead plaintiff and for Chitwood & Harley to be appointed lead counsel. PBHG originally alleged losses in excess of $4.3 million, but in a May 27, 1998 motion to supplement its original motion, PBHG revised its estimate to $2.756 million using the November 6, 1996–December 9, 1997 class period.

## IV. The PSLRA Determinations

### A. Most Adequate Plaintiff Presumption

■ The PSLRA calls for greater supervision by the Court in the selection of which plaintiffs will control the litigation. Since the Act was passed courts interpreting the lead plaintiff provisions have taken different views, some allowing only a single lead plaintiff,[2] others allowing groups of more than one plaintiff.[3] I find and conclude that in the circumstances of this particular case, the interests of the proposed class will be best served by a group of three co-lead plaintiffs consisting of (1) ColPERA; (2) the Vogel Group (limited to Mr. Hurley, Mr. Weber and Mr. Sabbia); and (3) PBHG, with each exercising a single equal vote. This structure provides the proposed class with the substantial benefits of joint decision-making and joint funding and is consistent with the language of the PSLRA and the purpose of Congress in enacting it.

The House Conference Report on the PSLRA stated that the lead plaintiff provisions were "intended to encourage the most capable *representatives* of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class." H.R.Rep. No. 104–369 at 32 (1995) *reprinted in* 1996 U.S.C.C.A.N. 730 (emphasis added). The House Report also stated that:

> Throughout the process, it is clear that the plaintiff class has difficulty exercising any meaningful direction over the case brought on its behalf ... Because class counsels' fees and expenses sometimes amount to one-third or more of recovery, class counsel frequently has a significantly greater interest in the litigation than any individual member of the class.

---

**2.** See *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y.1997) ("To allow an aggregation of unrelated plaintiffs to serve as lead plaintiff defeats the purpose of choosing a lead plaintiff"); *Gluck v. CellStar Corp.*, 976 F.Supp. 542, 549 (N.D.Tex.1997) ("Here ... where the interest of one institutional investor in the litigation far exceeds the interests of the other purported plaintiffs, nothing persuades the Court to appoint co-lead plaintiffs.").

**3.** See *In re Ride, Inc. Sec. Litig.*, C–97–402WD, slip op. at 3 (W.D.Wash. Aug. 5, 1997) ("On its face this language calls for aggregation. Any suggestion to the contrary, based on legislative history, cannot prevail against the statute's plain wording."); *In re Read–Rite Corp. Sec. Litig.*, C–97–20059 RMW, slip op. at 4 (N.D.Cal. May 27, 1997) ("Although the plain language of the Act does not expressly allow or prohibit such a pooling of shares, nothing in the text prevents the aggregation of shares by the Proposed Lead Plaintiffs to constitute the largest financial interest."); *D'Hondt v. Digi Int'l*, 1997 WL 405668 *3 (D.Minn. Apr. 3, 1997) ("In our view, when, as here, the putative class may total in the hundreds of thousands, if not millions, an arbitrary limit on the number of proposed Lead Plaintiffs would be unrealistic, if not wholly counterproductive."); *Greebel v. FTP Software, Inc.*, 939 F.Supp. 57 (D.Mass.1996)

*Id.* at 17–18. In this case ColPERA, the Vogel Group and PBHG have all suffered significant losses. Two of the plaintiffs are institutional investors, as specifically encouraged by the PSLRA. *See* H.R.Rep. No. 104–369 at 34 (Congress "intend[ed] that the lead plaintiff provision will encourage institutional investors to take a more active role in securities class action lawsuits."). The third plaintiff, the Vogel Group, while not an institutional investor, has been limited by the Court to three individuals, each of whom has suffered from two to three million dollars in losses. The Court is convinced that the limited size of the Vogel Group coupled with the scope of each individuals' loss will make the Vogel Group, as reduced by the Court, an effective monitor of its counsels' performance, thereby fulfilling the purpose of the PSLRA.

The Court is also concerned with the potential costs and expenses of this litigation. At the June 11th hearing (also in ColPERA's Memorandum of Law dated June 3, 1998, p. 18 n. 8 and in the Declaration of George Kim Johnson ¶ 3) counsel for ColPERA at first represented to the Court without qualification that ColPERA itself would fund the expenses of the litigation. Upon questioning by the Court, this representation became somewhat diluted.

| | |
|---|---|
| Mr. Eisenhofer: | I also believe that Mr. Johnson has made a commitment that Colorado will fund the expenses of this litigation. And in addition, the adequacy of Colorado as a class plaintiff can be shown by a situation where Colorado is in somewhat— |
| The Court: | You mean the state pension fund is going to pay out of pension funds the disbursements and fees? |
| Mr. Eisenhofer: | Not the fees, your Honor. The expenses, the disbursements. They have agreed to do that. |
| The Court: | Without limitation of amount? |
| Mr. Eisenhofer: | Well, your Honor, you might be giving Mr. Johnson some ideas, but I would not say that it is unlimited carte blanche, but I believe his agreement is to fund reasonable expenses in this case. |
| The Court: | You see, ordinarily, in such litigation, the attorneys are fronting the money. We don't ordinarily expect that the client does. The client still has an attorney-client relationship with the attorney, no matter what designations or orders I make. And if the day comes when the client says, "well, too much has been spent, and the outlook doesn't really justify it, we want to get the settlement discussions differently channeled than they presently are," you're going to be faced with a real conflict with the class, because financing the case is not coming from your law partners, but directly from a single client in the case. |
| Mr. Eisenhofer: | Well, your Honor, that would be the situation if not for the fact that my firm and the other firms that are members of the Executive Committee have agreed to advance the cost of this litigation. And should Colorado at any point decide— |
| The Court: | I thought you told me earlier that Colorado was doing it. |
| Mr. Eisenhofer: | They have agreed to do that. But if at any point in this case Colorado decides it does not want to advance further costs in the case, we have committed that we will advance the costs ourselves, and the other members of the Executive Committee. We did not take the representation on the condition— |
| The Court: | You see, if I have only one representative, then once the client gets disenchanted with the ongoing costs, the impetus for settlement is greater than it usually is in these cases, and the court in a way, will be adversely affected, because our case law tells us that we have to respect the opinion advanced by proponent's counsel in settlement. If I have two to three representatives, or even more, I don't face that risk at all, because if they all did agree, then the court can have real confidence that we are not being affected by any possible differences in aims or viewpoints. |

*See* Transcript of June 11, 1998 hearing ("Transcript") p. 19–21. The use of multiple lead plaintiffs will best serve the interests of the proposed class in this case because such a structure will allow for pooling, not only of the knowledge and experience, but also of the resources of the plaintiffs' counsel in order to support what could prove to be a costly and time-consuming litigation.

While the legislative history of the PSLRA suggests a desire that institutional investors be preferred as class representatives, not all institutional investors are similarly situated. A class representative, once designated by the Court, is a fiduciary for the absent class members. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (class representative is

volunteer who assumes position of fiduciary nature); *Kline v. Wolf,* 88 F.R.D. 696, 700 (S.D.N.Y.1981), *aff'd* 702 F.2d 400 (2d Cir. 1983) (class representative serves as fiduciary to advance and protect interests of those whom he purports to represent). ColPERA enters the litigation already burdened by a primary fiduciary obligation to the present and future government pensioners of the state of Colorado.[4] Private claimants such as the Vogel Group may incur deposition costs and other disbursements in pursuit of their own claims and that of the class, without limitation. ColPERA, on the other hand, cannot pursue litigation with trust funds for the benefit of class members who are not beneficially interested in the trust. If the reasonable prospects of recovery do not exceed the costs accrued, such a fiduciary becomes conflicted and may have to drop out. Such a potential conflict has a serious adverse bearing on settlement dynamics.[5]

In addition the plain language of the PSLRA expressly contemplates the appointment of more than one lead plaintiff, *see* 15 U.S.C. §§ 78u–4(a)(3)(B)(i) (court "should appoint as lead plaintiff *the member or members* of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of the class members ..."); 78u–4(a)(3)(B)(iii)(I) ("the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is *the person or group of persons* that ..."); 78u–4(a)(3)(B)(iv) ("discovery relating to whether *a member or members* of the purported plaintiff class is the most adequate plaintiff may be conducted by a plaintiff only if ...") (emphasis added). Finally the use of a tripartite lead plaintiff structure with each of the three lead plaintiffs exercising one equal vote will prevent any possibility of deadlock over an issue.

## B. Securities and Exchange Commission's Amicus Curiae Memorandum

On May 29, 1998 the Securities and Exchange Commission ("the SEC" or "the Commission") filed an amicus curiae memorandum in which it argued for the appointment of ColPERA as the sole lead plaintiff, stating:

> The Public Employees Retirement Association of Colorado ('Association') has moved under the Act to be appointed sole lead plaintiff in these cases and for approval of its choice as lead counsel. A plaintiff group of approximately 30 individuals and three entities known as the 'Vogel Plaintiffs' seeks to be appointed 'co-lead plaintiff,' with its chosen counsel serving as 'co-lead counsel.' The Commission believes that if the Court determines that the Association qualifies under the Litigation Reform Act to be appointed as lead plaintiff, it should not appoint the Vogel Plaintiffs as co-lead plaintiff.

*See* SEC Memorandum p. 1.

At the June 11th hearing (and in the PBHG Funds' Memorandum of Law in Response to the Securities and Exchange Commission's Amicus Curiae Memorandum, dated June 3, 1998 at p. 2) Mr. Chitwood of Chitwood & Harley, the law firm representing PBHG, stated that the SEC was unaware that PBHG had also filed a motion for appointment as lead plaintiff. The following exchange took place at the June 11, 1998 hearing:

Mr. Chitwood: I might add that I spoke with the SEC after they filed their amicus brief. They did not know we had an

---

**4.** While not within the coverage of ERISA, *see* 29 U.S.C. § 1003(b)(1), the same fiduciary obligations are inherent in a state pension fund as apply to the ordinary employee benefit plan. Fiduciary duties with respect to an ERISA plan must be discharged "solely in the interest of the participants and beneficiaries and—(a) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). *See Norman v. Arcs Equities Corp.,* 72 F.R.D. 502, 504 (S.D.N.Y. 1976).

**5.** An overwhelming percentage of securities class actions are settled once all the relevant facts have been ascertained. *See* Joseph A. Grundfest and Michael A. Perino, *Ten Things We Know and Ten Things We Don't Know About the Private Securities Litigation Reform Act of 1995,* 1015 PLI/Corp. 1015, 1027 (1997) (quoting a study that 87.6% of securities class actions filed from April 1988 through September 1996 ended in settlement).

application for lead plaintiff in this litigation.

**The Court:** What is your authority for saying that?

**Mr. Chitwood:** I spoke with the person who has provided to your Honor—

**The court:** The author of the brief?

**Mr. Chitwood:** Louis de la Torre, who wrote the letter and provided his name for your Honor to call. I believe, your Honor, that they believe that there were only two movants, and they thought they may be at loggerheads, that is, the Vogel plaintiffs and the Colorado PERA.

**The Court:** You see, if that's really so, they have an obligation to correct their misapprehension, if such it is. And it seems to me that if you were going to speak with the SEC on that basis that you should have done so by letter, perhaps with a copy to your adversaries and the Court. Because the Court has to give great deference to the fact that the Commission is in a specialized field where it is engaging every day in regulatory issues. And the Court simply because of its own experiences or it own views of litigation generally, can't just wave their objection aside and say, "well, we will reach a consensus here to do this thing."

I'm very concerned about the position taken by the Commission. But if the Commission is under a misapprehension and someone told you that, they ought to be telling everybody that, including the Court.

**Mr. Chitwood:** I agree with your Honor, and I submitted that in my last brief.

**The Court:** There is no great desire on their part to come up here. I hear oral arguments on matters. I don't take grave matters under submission. And I'm glad to hear from people and give them the chance of exchange with each other and with the Court. In a sense, I am slightly disappointed that they are not here, although staff was told that it was up to them, if they wanted to come they could, and if they didn't want to, they didn't have to. I can't find fault with that.

But you're telling me that they acted under a misapprehension. I think that should be made a matter of record, and the Commission ought to have a chance to respond to it.

**Mr. Chitwood:** I'll be glad to put it in an affidavit. I also put it in my last brief to the Court, your Honor … I might add, your Honor, I sent a copy of the brief to the SEC by Federal Express, and they confirmed by telephone that they received it. This is a few days ago.

**The Court:** Well, alright. If you want to communicate with them, with copies to your adversaries and co-participants, you're free to do so. I'm not directing you to do so, but I think that's what you ought to do.

**Mr. Chitwood:** Yes, sir, I will do that. Thank you sir.

**The Court:** Because if they're under a misapprehension, they have an obligation to tell me. It's not enough just to tell you.

**Mr. Chitwood:** They are not under that misapprehension any more, because I sent them the lead applications. It was their understanding, as the person that sent his name as the contact person …

*See* Transcript p. 40–42. Mr. Chitwood subsequently provided the Court with (1) his affidavit stating that he spoke with Mr. de la Torre by telephone several days after receiving the SEC's amicus memorandum, and (2) a letter dated May 24, 1998 which his firm sent to Mr. de la Torre at the SEC stating:

[a]s you know, this firm represents the PBHG Funds in the above-referenced action. I understand that the SEC was unaware of the PBHG Funds' pending motion for appointment as lead plaintiffs when you filed the SEC's amicus memorandum regarding the appointment of more than one lead plaintiff. Please find enclosed courtesy copies of the following pleadings we filed in support of the PBHG Funds' motion for appointment as lead plaintiffs.

Mr. Chitwood also submitted the Federal Express receipt for the letter. To date the Court has received no response from the Commission or the attorney for the Commission.

Ordinarily the opinion of the SEC is entitled to great deference in all matters involving the federal regulation of securities. In this case the SEC argues that Vogel (the original conglomeration of approximately 35 investors) should not be appointed as a co-lead plaintiff with ColPERA. The Commission acknowledges that the plain language of the PSLRA allows for the appointment of more than one plaintiff, and recognizes that courts applying the PSLRA have appointed

groups of plaintiffs who have aggregated their losses to serve as lead plaintiffs. *See* SEC Memorandum p. 3, 8. The Commission argues, however, that there is no precedent in the case law for "the appointment of two *competing* groups of plaintiffs with separate counsel as co-lead plaintiffs." *Id.* The weight to be attached to this argument is lessened by the unexplained failure of the Commission to appear and attend the hearing, and by the fact that the Court has received no response to the allegations made at the hearing.

As noted above, the PSLRA expressly contemplates the appointment of more than one plaintiff, and this Court finds no basis in the statute for the distinction drawn by the SEC between competing and non-competing groups of plaintiffs. It should also be noted that the lead plaintiff movants are not in fact competing with each other. Each is seeking the same result—the greatest recovery for the class consistent with the merits of the claims raised, the defenses asserted and the burdens and risks of litigation. The rebuttable presumption created by the PSLRA which favors the plaintiff with the largest financial interest was not intended to obviate the principle of providing the class with the most adequate representation and in general the Act must be viewed against established principles regarding Rule 23 class actions. Allowing for diverse representation, including in this case a state pension fund, significant individual investors and a large institutional investor, ensures that the interests of all class members will be adequately represented in the prosecution of the action and in the negotiation and approval of a fair settlement, and that the settlement process will not be distorted by the differing aims of differently situated claimants.

The SEC also states that even the appointment of only two lead plaintiffs limits the ability of those plaintiffs "to control the litigation, and in particular to control the conduct of lawyers." SEC Memorandum at 16. It is unclear to this Court why the appointment of more than one lead plaintiff will limit the ability of each plaintiff to control its own chosen counsel. In any case, in actuality a greater number of plaintiffs allows them, as a group, to wield more control over counsel.

*See D'Hondt v. Digi Int'l,* 1997 WL 405668 *3 ("the assertion can legitimately be made that the larger the number of proposed Lead Plaintiffs, the greater the dilution of the control that those Plaintiffs can maintain over the conduct of the putative class action, [while] an equally cogent assertion can be broached that, when more greatly numbered, the Lead Plaintiffs can more effectively withstand any proposed effort by the class counsel to seize control of the class claims.").

Because the PSLRA does not recommend or delimit a specific number of lead plaintiffs, the lead plaintiff decision must be made on a case-by-case basis, taking account of the unique circumstances of each case. In light of the magnitude of this case, the Court concludes that the use of three lead plaintiffs is the most reasonable means. Such a structure allows for broad representation and the sharing of resources and experience to ensure that the litigation will proceed expeditiously against Oxford and the experienced counsel it has retained to represent it, and will assure the Court that any settlement when proposed will be provident.

### C. Rule 23 Requirements

■ The final requirement of the PSLRA for appointment of lead plaintiff is that a lead plaintiff must "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(1)(cc). Rule 23(a) provides that:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties fairly and adequately protect the interests of the class.

Typicality and adequacy of representation are the only provisions relevant to a determination of lead plaintiff under the PSLRA. *See Gluck,* 976 F.Supp. at 546; *Fischler v. AmSouth Bancorporation,* 1997 WL 118429 *2 (M.D.Fla.1997). The claims of ColPERA,

the Vogel Group and PBHG are typical of the class because their claims and injuries arise from the same conduct from which the other class members' claims and injuries arise. *See In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992), *cert. denied sub nom., Hart Holding Co., Inc. v. Drexel Burnham Lambert Group, Inc.,* 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993). At the present time it is unclear what defenses, if any, will be raised against particular class members, but it is far less likely that any potential ·defenses would successfully rebut a finding of typicality where more than one investor or group of investors who made the decision to purchase the security is appointed as class representative.

All three plaintiffs also satisfy the adequacy requirement because there is no conflict of interest between any of the three lead plaintiffs and the members of the class and because each lead plaintiff has obtained qualified, experienced counsel. *Drexel,* 960 F.2d at 291.

### V. Appointment of Lead Counsel

■ As noted above the Court finds that each plaintiff has chosen competent, experienced counsel and grants the motions of Grant & Eisenhofer, P.A., Milberg Weiss Bershad Hynes & Lerach, L.L.P., and Chitwood & Harley to be appointed as co-lead counsel in this action. This is done with the understanding that there shall be no duplication of attorney's services and that the use of co-lead counsel will not in any way increase attorney's fees and expenses. *See Donnkenny,* 171 F.R.D. at 158. The disbursements shall be financed equally by the three co-lead counsel, subject to such additional support of the litigation which may be furnished by members of the Executive Committee. This Court is confident, based on the representations made at the hearing and in light of the experience of each of the firms,[6] that they will work together to maximize recovery for the proposed class.[7]

### VI. Liaison Counsel

At the June 11, 1998 hearing the Court signed an order appointing the law firm of Lowey, Dannenberg, Bemporad & Selinger, P.C., to act as liaison counsel. This firm shall be charged with administering communications between the Court and counsel (i.e., receiving and distributing orders on behalf of the group), keeping counsel apprised of developments in the case and scheduling matters, and generally assisting in coordination, including, if the parties so desire, maintaining a document depository.

### VII. Executive Committee

Any attorney or firm of attorneys representing a plaintiff or group of plaintiffs having losses in excess of $450,000 may affiliate himself, herself or itself with and become a member of an Executive Committee. The Executive Committee shall be co-chaired by the three lead counsel. The function of the Committee will be to allocate, in the most convenient and economic fashion, the non-

---

**6.** The Court has reviewed the resumes of each of the three co-lead counsel. Grant & Eisenhofer, P.A., is a small firm (two name partners, two "of counsel" and three associates) based in Wilmington, Delaware and is currently acting as lead counsel in *Gluck v. CellStar,* 976 F.Supp. 542 (N.D.Tex.1997); *In re Occidental Petroleum Corp. Litig.,* Cal.Super., C.A. No. BC 185009 (Feb. 27, 1998); *Kropinski v. Johnson & Johnson,* N.J.Super., C.A. No. L–8886–96.

Milberg Weiss Bershad Hynes & Lerach, L.L.P., is a large firm with over 50 attorneys in its New York office. It has extensive experience in prosecuting large securities class actions. *See, e.g ., In re Read–Rite Corp. Sec. Litig.,* C.A. No. C97–20059 RMW (D.Cal. May 28, 1997); *Malin v. Ivax Corp. et al.,* C.A. No. 96–1843–Civ–Moreno at 8 (S.D.Fla. Oct. 31, 1996); *Greebel v. FTP Software,* 939 F.Supp. 57 (D.Mass.1996).

Chitwood & Harley is also a small firm (five members) which concentrates its practice in complex civil litigation including securities class actions. The firm is based in Atlanta and has achieved favorable results in a number of securities class action cases. *See, e.g., In re 1996 Medaphis Corp. Sec. Litig.,* C.A. No. 1:96–CV–2088–TWT (N.D.Ga.1996); *Stoudt v. E.F. Hutton & Co., Inc.,* C.A. No. 87–CV4524 (S.D.N.Y.).

**7.** But for the statutory imperative that the amount of the loss should be presumptively controlling, the Court would have considered as a co-lead plaintiff the Saura Group, represented by Schoengold & Sporn, P.C. and MacMillan & Lucas. The Saura plaintiffs bring to the table the investment knowledge and experience of two International Union Pension Funds. However, the losses of the Saura Group are less than those of PBHG.

strategic work arising from this litigation. Members of the Executive Committee who have been delegated to perform specific functions in connection with research, discovery or other matters must carry their own disbursements and costs. The efforts of the Executive Committee are to be conducted economically and without duplication.

Lead counsel shall submit an itemized report to this Court ten days after October 1, 1998 and shall submit reports quarter-annually thereafter, detailing the services rendered, the costs expended and the hourly charges reasonably incurred.

### VIII.  Options Subclass

At the June 11th hearing attorney Howard Longman from the law firm of Stull, Stull & Brody made a motion for the Court to appoint plaintiff Al Tawil as lead plaintiff of a sub-class of investors who lost money on options to buy and sell Oxford stock during the alleged class period. Counsel for Oxford and counsel representing other plaintiffs who lost money on options stated their belief that it would be premature for the Court to delineate a separate options sub-class at this stage. This Court agrees. The issue of a potential options sub-class will be deferred until pre-trial discovery has delineated the issues to be tried. Any objections to the formation of such a sub-class will be heard at that time.

### IX.  Conclusion

For the reasons stated above ColPERA, the Vogel Group (consisting of Mr. Hurley, Mr. Weber and Mr. Sabbia) and PBHG will be the lead plaintiffs in this litigation and Grant and Eisenhofer, P.A., Milberg Weiss Bershad Hynes & Lerach, L.L.P., and Chitwood & Harley are appointed as co-lead counsel. An Executive Committee shall be formed in accordance with this decision. The Court reserves the right to alter this structure at any time and for any reason, and will do so if it finds that the progress of the litigation is being delayed, that expenses are being unnecessarily enlarged, or if the structure established proves detrimental, in any way, to the best interests of the proposed class.

The lead plaintiffs shall have 30 days from the date of this order, unless enlarged by the Court, in which to serve a consolidated amended complaint. The amended complaint shall allege the largest class period which in the judgment of counsel is supported by the facts. Following consultation with the defense attorneys, a proposed discovery and case management plan shall be submitted within 30 days thereafter, for consideration and approval by the Court. If the attorneys are unable to agree on such a plan, the Court shall be notified immediately, and will schedule a hearing.

At this time all other pending motions directed to the prior complaints and for other relief are denied with leave to renew after the consolidated amended complaint is filed.

A formal order may be settled on ten (10) days notice giving effect to the directions set forth herein.