In re **HOST AMERICA CORP. SECURITIES LITIGATION**

No. 3:05 CV 1250(JBA).

United States District Court, D. Connecticut.

April 10, 2006.

James E. Miller, Patrick A. Klingman, Sheperd Finkelman Miller & Shah, Chester, CT, for Plaintiff.

Craig A. Raabe, Jason Marc Kuselias, Robinson & Cole, Hartford, CT, Kay B. Lee, Peter M. Casey, Greenberg & Traurig, Boston, MA, for Defendants.

## RULING ON MOTIONS FOR APPOINTMENT OF LEAD PLAINTIFF AND COUNSEL [Docs.## 19, 22, 25, 32, 33, 36, 37, 48]

ARTERTON, District Judge.

Before the Court are fourteen consolidated class action lawsuits against Host America Corporation ("Host America"), a Connecticut corporation that provides food service management, energy management conservation and pre-employment background screening, Energysync, an affiliate of a Host America subsidiary, and four individual defendants who are officers and/or directors of the defendant corporations. Seven groups and one individual originally moved to be appointed lead plaintiff and for their attorneys to be appointed lead counsel: the Haynes Group, the Host Investors Group, the Bigelow Group, Conlin's Investor Group, the DMC Group, the Andreski Group, the Carolantic Group, and Jonathan Destler.[1] *See* [Docs. ## 19, 22, 25, 32, 33, 36, 37, 48]. Of these, the Host Investors Group and the Bigelow Group have formally withdrawn their motions, *see* [Docs. ## 61, 62], and all but the DMC Group and the Carolantic Group have neglected to file opposition motions and thus apparently are no longer pursuing their motions.[2] For the reasons discussed below, the Court appoints the Carolantic Group as lead plaintiff and approves its selection of Scott + Scott, LLC as lead counsel.

## I. Factual Background

All complaints filed against defendants in this consolidated action contain similar claims, alleging that defendants violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, by issuing a series of material misrepresentations. These include statements in a July 12, 2005 press release and a Form 8–K filed with the SEC announcing a deal with Wal–Mart for Wal–Mart to utilize Host America's LightMasterPlus technology, thereby artificially inflating the price of Host America stock, buyers of which suffered losses when the misrepresentations were revealed, an SEC investigation was commenced, and trading of Host America securities was halted on July 22, 2005.

The complaints allege that statements made in July 2005 regarding a purported

---

1. Defendants have filed responses to the motions, advancing no position but observing that "[t]he Court's appointment of a lead plaintiff ... should be without prejudice to plenary consideration of the requirements of Rule 23 in connection with any subsequent motion for class certification," "reserv[ing] all grounds to contest any motion under Rule 23 for certification of any class and determination of a class representative," and noting that "at this juncture, it is unnecessary for [d]efendants to respond to the myriad legal and factual contentions in the eight separate motions, supporting memoranda and affidavits." *See* [Docs. ## 63–68].

2. The DMC Group represented in its Reply Memorandum that "only the DMC Group and the Carolantic Group continue to seek appointment as lead plaintiff," *see* [Doc. # 75], and none of the other lead plaintiff candidates have corrected this representation. Likewise, in its Response Brief, the Carolantic Group represented that in addition to the Host Investor and Bigelow Groups, Conlin's Investor Group has also expressed its non-opposition to the appointment of the Carolantic Group as lead plaintiff, *see* Doc. # 70, and Conlin's Investor Group has not objected to this characterization.

agreement with Wal–Mart for the installation of its LightMasterPlus technology in ten Wal–Mart stores, characterizing this as the "first-phase roll out," stating "the next phase will involve a significant number of stores," and noting "[t]his is a major event for our company," were materially false and misleading because the defendants knew, but failed to disclose: (1) that Host America's relationship with Wal–Mart was limited to a test installation; (2) that Host America had no agreement for any subsequent installations in other Wal–Mart stores; and (3) that as a result of the foregoing, defendants' statements were lacking in a reasonable basis at all relevant times.

## II. Private Securities Litigation Reform Act

The Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 77z–1, was designed to end the "race to the courthouse" by plaintiffs' lawyers and "encourage the most capable representatives of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class." H.R. Conf. Rep. 104–369, at 34, reprinted in 1995 U.S.C.C.A.N. 730, 733. Specifically, the law was "intended to increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." *Id.*

To these ends, the statute prescribes detailed procedures to be followed in the initial stages of securities class action cases. First, the plaintiff in the earliest-filed case must publish notice in "a widely circulated national business-oriented publication or wire service" regarding "the pendency of the action, the claims asserted therein, and the purported class period..." 15 U.S.C. § 77z–

1(a)(3)(A)(i)–(ii). Attorneys for the plaintiff in the first-filed Host America matter, *Yorks v. Host America Corp.*, 3:05cv1250, published such a notice on August 8, 2005, and therefore this element is not contested here.

Second, where there are several actions pending and there is a motion to consolidate, the court must decide that motion. 15 U.S.C. § 77z–1(a)(3)(B)(ii). This Court granted the motions to consolidate the fourteen Host America cases on September 22, September 28, and October 20, 2005, *see* [Docs. ## 5, 12, 58].[3]

Third, "[a]s soon as practicable after such [consolidation] decision is rendered, the court shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions..." *Id.* § 77z–1(a)(3)(B)(ii). To serve as lead plaintiff, the movant must file a sworn certified statement with the complaint stating that he or she reviewed and authorized the filing of the complaint; did not purchase the securities at the direction of counsel or in order to participate in a lawsuit; and is willing to serve as the lead plaintiff on behalf of the class. The plaintiff must also identify all of his or her transactions in the securities covered by the class period, and any other lawsuits in which the plaintiff has sought to serve as lead plaintiff in the last three years. The adequacy of the Carolantic Group's statements are discussed below.

In determining the "most adequate plaintiff," the statute creates a presumption in favor of "the person or group of persons that:—(aa) has either filed the complaint or made a motion [to be the lead plaintiff]; (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* § 77z–1(a)(3)(B)(iii)(I). This presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presump-

---

**3.** On October 20, 2005, the Court issued a Supplemental Consolidation and Scheduling Order, separately consolidating two derivative litigations, *Freede v. Ramsey*, 3:05cv1326 and *Cheek v. Ramsey*, 3:05cv1434, with the instant action, for administrative purposes, and ordering that all pleadings or documents for such cases be filed under the caption "*In re Host America Corp.*

*Securities Litigation,* Docket Number 3:05cv1250 (JBA)—This Document Relates to In re Host America Corp. Derivative Litigation." *See* [Doc. # 58]. The Court also appointed the derivative plaintiffs' attorneys as co-lead counsel. *Id.* Thus, this ruling does not affect or alter that Consolidation and Scheduling Order.

tively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 77z–1(a)(3)(B)(iii)(II).

■ As the Ninth Circuit explained, in choosing the most adequate plaintiff,

the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit. It must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.' If the plaintiff with the largest financial stake in the controversy provides information that satisfies these requirements, he becomes the presumptively most adequate plaintiff. If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23.

*In re Cavanaugh,* 306 F.3d 726, 730 (9th Cir.2002). In other words, the Court should not undertake a comparative review of all the lead plaintiff motions. Rather, the Court should consider the motions sequentially, from greatest to smallest loss, applying the presumption that the plaintiff with the greatest loss should be the lead plaintiff, unless and until that presumption is rebutted by a showing that that plaintiff does not meet the Rule 23 criteria. *Id.* at 732.

Of the four Rule 23 requirements—numerosity, commonality, adequacy, and typicality—only adequacy and typicality come into play when appointing a lead plaintiff under the PSLRA. *Constance Sczesny Trust v. KPMG, LLP,* 223 F.R.D. 319, 324 (S.D.N.Y. 2004); *In re Oxford Health Plans, Inc. Sec. Litig.,* 182 F.R.D. 42, 50 (S.D.N.Y.1998), *ap-*

*peal dismissed sub nom., Metro Servs. Inc. v. Wiggins,* 158 F.3d 162 (2d Cir.1998). In the Second Circuit, the tests for adequacy and typicality are the same under the PSLRA as in any class action. *See Hevesi v. Citigroup Inc.,* 366 F.3d 70, 83 (2d Cir.2004) ("[T]here is no reason to believe that the PSLRA altered the preexisting standard by which class representatives are evaluated under Rule 23.").

Once a lead plaintiff is chosen, the PSLRA requires that the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z–1(a)(3)(B)(v). Under this provision, "the court's role is generally limited to 'approv[ing] or disapprov[ing] lead plaintiff's choice of counsel;' and . . . it is not the court's responsibility to make that choice itself. . . . [T]he court should generally employ a deferential standard in reviewing the lead plaintiff's choices." *In re Cendant Corp. Litig.,* 264 F.3d 201, 274 (3d Cir.2001) (quoting H.R. Conf. Rep. No. 104–369, at 35, reprinted in 1995 U.S.C.C.A.N. 730, 734).

### III. Discussion

#### A. Appointment of Lead Plaintiff

#### 1. Plaintiffs Seeking Lead Plaintiff Status

■ The Carolantic Group ("Carolantic") asserts the largest financial interest in the case, claiming more than $4.2 million in combined losses due to defendants' alleged fraud. The group consists of an institutional investor, Carolantic Partners, LLC ("Carolantic Partners"), which lost approximately $3.6 million, and two individual investors—Ayman Alshami, who lost approximately $275,000, and Christopher B. Ticknor, who lost approximately $340,000. *See* Declaration of Erin Green Comite [Doc. # 37–3] at Ex. C.[4]

DMC Group ("DMC"), who pursues appointment to lead status, claims total losses of approximately $221,000. The group consists of one institutional investor, DMC

---

4. The two plaintiffs with the next largest losses are the Host Investors Group and the Bigelow Group, claiming losses of approximately $1 million and $560,000, respectively. Both have for-

mally withdrawn their motions in recognition of the fact that they do not claim the largest losses. *See* [Docs. ## 61, 62].

Lending, Inc. ("DMC Lending"), which lost approximately $121,000, and one individual, Bhaskar Bhakta, who lost approximately $101,000. *See* Declaration of Kathryn A. O'Brien [Doc. # 35] at Ex. C.

### 2. Method of Choosing Lead Plaintiff

The PSLRA provides that the "most adequate plaintiff" may be either a "person or group of persons." 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I). Courts have divided over whether a group of unrelated investors is the type of "group of persons" permitted to serve as lead plaintiff, with some courts taking the position that the PSLR "forbids aggregation of unrelated plaintiffs," *Aronson v. McKesson HBOC, Inc.*, 79 F.Supp.2d 1146, 1153 (N.D.Cal.1999); *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997), and other courts accepting a proposed lead plaintiff grouping without scrutiny, *see, e.g., In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 296 (E.D.N.Y.1998).

The majority of courts considering the issue have taken an intermediate position, allowing a group of unrelated investors to serve as lead plaintiffs when it would be most beneficial to the class under the circumstances of a given case, but selecting only a few lead plaintiffs from within a larger group proposed by counsel. *See, e.g., In re Baan Co. Sec. Litig.*, 186 F.R.D. 214, 217 (D.D.C. 1999); *Oxford Health Plans*, 182 F.R.D. at 46. For instance, the court in *Oxford*, 182 F.R.D. at 46, appointed as co-lead plaintiffs a state employees pension fund, a group of three individual investors culled from a proposed group of 35, and a fund management company.[5]

In this case, the two groups in the running—Carolantic and DMC—both contain three members or fewer and are thus both small enough to ensure that the plaintiffs are able to maintain control of the litigation. Both also contain institutional and individual investors, thus providing a diversity of representation reflective of the makeup of the class as a whole. *See Oxford*, 182 F.R.D. at 49; *In re Star Gas Sec. Litig.*, 04cv1766

(JBA), 2005 WL 818617 (D.Conn. Apr. 8, 2005). As discussed below, the Carolantic Group satisfies both typicality and adequacy requirements for lead plaintiff appointment.

### 3. Appointment of Lead Plaintiff

Carolantic is the presumptive lead plaintiff with over $4 million in combined losses and each of the individual investors in the group alone claiming losses larger than the combined losses claimed by DMC. Carolantic observes that the PSLRA presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff ... will not fairly and adequately protect the interests of the class," or "is subject to some unique defenses that render such plaintiff incapable of adequate representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

DMC opposes appointment of Carolantic as lead plaintiff, observing that "[a] movant's financial interest is just a beginning point," *see* DMC Response Brief [Doc. # 69] at 2 (citing *In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 377 (E.D.Va.2003)), and contending that while Carolantic may claim the greatest losses, it fails to satisfy the typicality and adequacy of representation requirements of Fed.R.Civ.P. 23, as is required by the PSLRA. DMC argues that Carolantic's declarations do not comply with the PSLRA in that they fail to set out all Host America stock transactions made during the relevant period and gloss over the data by listing cumulative shares bought/sold and average stock price. DMC claims that Carolantic Partners, the institutional member of the Carolantic Group, is a broker-dealer/hedge-fund that plays an investment management role, is not itself a purchaser or seller of securities, and thus has no financial stake or standing. DMC also contests Carolantic's typicality based on its trading patterns, in that it engaged in 900 trades in one day, suggesting that these patterns expose Carolantic to unique defenses, such as the argument "that Carolantic['s] ... investment strategy is not the approach of typical inves-

---

5. The Securities and Exchange Commission ("SEC") takes the position that a group of no more than three to five investors should be ap-

pointed as lead plaintiffs, to ensure that the plaintiffs are able to maintain control of the litigation. *See Baan*, 186 F.R.D. at 216–17.

tors who purchased (or sold) Host America securities in *reliance* on publicly available information." *See* DMC Reply [Doc. # 75] at 7 (emphasis in original).

Carolantic disputes DMC's attacks, arguing that its declarations are compliant with the PSLRA in that they contain all trading details, citing judicial authority appointing hedge funds and rejecting the argument that potential lead plaintiffs that engage in day trading are necessarily atypical, *see* Carolantic Reply [Doc. # 74] at 6–7, and claiming to have provided a cohesive management plan for leading the class, *see* Carolantic Response Brief [Doc. # 70] at 7; Declaration of Carolantic Partners [Doc. # 37–3, Ex. E]. The Court addresses DMC's objections, and Carolantic's responses, in turn.

The PSLRA requires that "[e]ach plaintiff seeking to serve as a representative on behalf of a class shall provide a sworn certification" that:

(i) states that the plaintiff has reviewed the complaint and authorized its filing;

(ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;

(iii) states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

(iv) sets forth all of the transactions of the plaintiff in the security that is the

subject of the complaint during the class period specified in the complaint;

(v) identifies any other action under this chapter, filed during the 3–year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and

(vi) states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).

15 U.S.C.A. § 78u–4(a)(2)(A). Carolantic has provided the certifications of its members Carolantic Partners, Ayman Alshami, and Christopher Ticknor.[6] DMC views these declarations as failing to satisfy requirement (iv) because they summarize the transactions made during the relevant time period, rather than listing all such transactions. In fact, the certifications append loss charts and transaction records that list and document all such transactions (including date, amount, and share price), *see* [Doc. # 37–3, Exs. A, C], and thus comply with the PSLRA.[7]

DMC also disputes the standing of Carolantic Partners, a member and proposed "chairperson" of the Carolantic Group, and assails the Carolantic Group's typicality and adequacy of representation because Carolantic Partners is a hedge fund that engages in day-trading.[8] First, DMC claims that because John J. Furman, who executed Carolantic Partners' certification on its behalf,

---

**6.** The Carolantic Group has also submitted the declaration of Randolph A. Smiroldo, *see* [Doc. # 37–3, Ex. A], a purchaser of Host America warrants who supports selection of the Carolantic Group as lead plaintiff and is willing to serve as a representative purchaser of Host America warrants at the class certification stage.

**7.** DMC claims that the Carolantic declarations are non-compliant with the PSLRA because they summarize their trading data and list their transactions in separate exhibits. The Court sees no significance to DMC's objection to the format of Carolantic's declarations, particularly where the case cited by DMC, *Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 409–10 (D.Minn.1998), discussed the necessity of providing certifications

with motions for appointment of lead plaintiff, but did not address the adequacy of the format of declarations. Further, on reply the Carolantic Group submitted supplemental declarations from each of its members, declaring under penalty of perjury that the information—including trade records—submitted in their original declarations was accurate. *See* Reply Declarations [Doc. # 74–2, Ex. A].

**8.** DMC also challenges the fact that John J. Furman, Managing Member of Carolantic Partners, LLC, signed the Carolantic Partners, LLC's certification. The Court sees no flaw in a managing member of a corporate entity executing a certification on behalf of that entity.

and Carolantic Management, the manager of Carolantic Partners has no financial stake in this litigation (it suffered no losses), "they cannot satisfy the PSLRA's most basic requirement for being appointed lead plaintiff." DMC Reply at 6 (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)). However, neither Mr. Furman nor Carolantic Management are members of the Carolantic Group and therefore their lack of cognizable losses is irrelevant. Carolantic's papers show that each of its members—Carolantic Partners, Ayman Alshami, and Christopher Ticknor—suffered substantial losses as a result of defendants' alleged fraud. *See* Certifications [Doc. # 37-3, Ex. A]; Loss Charts and Transaction Records [Doc. # 37-3, Ex. C] (documenting losses for Carolantic Partners as $3,600,254, losses for Ayman Alshami as $275,580.56, and losses for Christopher Ticknor as $340,436.41); Declaration of Carolantic Partners [Doc. # 37-3, Ex. E] at ¶ 2.

As to DMC's objection to Carolantic Partners being a hedge fund and day-trader, hedge funds have been selected as lead plaintiff in other securities fraud cases and many courts have concluded that the fact that a candidate for lead plaintiff engaged in day-trading does not necessarily render that individual or entity atypical or inadequate at representing the class, reasoning "where the public market of a quoted security is polluted by false information . . . all types of investors are injured." *Oxford*, 199 F.R.D. at 124.[9] Further, Carolantic explains that contrary to DMC's suggestion, Carolantic Partners did not engage in over 900 trades, but "[r]ather, Carolantic Partners utilizes an online discount brokerage . . . which uses a technique it calls 'SmartRouting' to achieve the optimal share price for an institutional investor, such as Carolantic Partners, when executing its trade orders . . . [which involves] break[ing] down a single large order into smaller lots and spread[ing] these 'order legs' across multiple market centers to achieve the best price for an order." Carolantic Reply at 5; *accord* Carolantic Partners Reply Decl. [Doc. 74-2, Ex. A] at ¶ 5.

Lastly, DMC questions Carolantic's cohesiveness as a group, pointing to the fact that the Declaration of Carolantic Partners in

---

**9.** *See also Basic, Inc. v. Levinson*, 485 U.S. 224, 246–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("[I]t has been noted that 'it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?' ") (quoting *Schlanger v. Four-Phase Sys. Inc.*, 555 F.Supp. 535, 538 (S.D.N.Y.1982)); *In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65, 108 (S.D.N.Y. 2004) ("[D]ay and momentum traders have the same incentives to prove defendants' liability as all other class members, and their presence in a securities class does not create intra-class conflicts."); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.*, 229 F.R.D. 395, 415 (S.D.N.Y.2004) (one plaintiff's allegation that another was "a massive day-trading operation—using program trading to dart in and out of NYSE stocks in small trades, thousands of times a day," absent "any specific showing as to why transactions by day-traders or in-and-out traders should be disregarded or discounted" did "not suffice to establish that [day trading plaintiff] [was] subject to a unique defense"); *In re Royal Ahold N.V. Sec. & Erisa Litig.*, 219 F.R.D. 343, 354–55 (D.Md.2003) (rejecting suggestion that "one of the largest institutional trading firms in the United States and [ ] a reporting member of the National Association of Securities Dealers and a licensed broker-dealer in Colorado" "is atypical because it is a day-trader, and day-traders allegedly do not rely on the financial statements or the fundamental value of a company as the rest of the market does," concluding "where false information and misleading omissions pollute the market, all types of investors are injured").

The cases cited by the DMC Group to the contrary are from outside of this Circuit and are factually distinguishable. *See In re Safeguard Scientifics*, 216 F.R.D. 577, 582–83 (E.D.Pa. 2003) (proposed representative plaintiff on class certification motion was atypical where he increased his stock holdings even after public disclosure of the alleged fraud, raising doubts as to the existence of a unique defense against him rebutting the reliance presumption); *In re MicroStrategy Inc. Sec. Litig.*, 110 F.Supp.2d 427, 436–37 (E.D.Va.2000) (institutional investor lead plaintiff candidate that submitted "a conclusory affidavit and a collection of indecipherable financial statements" was found to be atypical on the basis of potential unique defenses, including the fact that the candidate apparently incurred most of its losses before defendants issued the first correction, whereas most class members incurred losses thereafter); *In re Bank One Shareholders Class Actions*, 96 F.Supp.2d 780, 784 (N.D.Ill.2000) (hedge fund lead plaintiff candidate that engaged in extensive day-trading and was not simply a buyer for its own account rejected as lead plaintiff "in preference to the handful of institutional investors who make up the Pension Group with greater aggregate claimed losses").

support of Carolantic's motion [Doc. # 37–3, Ex. E] is signed by a representative of the manager of Carolantic Partners, and not by the other members of the Carolantic Group. This fact seems inconsequential where there is no requirement for a joint certification (indeed DMC filed no such certification), and each of the three members of the Carolantic Group filed individual certifications *and* reply certifications. Additionally, Carolantic was the only candidate for lead plaintiff to advance a plan for class coordination, coordination with counsel, and efficient handling of litigation issues as they arise, including quarterly conferences, a dispute resolution protocol if consensus cannot be reached, and a procedure for convening meetings with counsel on 24 hours notice. *See* [Doc. # 37–3, Ex. E] at ¶ 5.[10]

Thus, because Carolantic is the presumptive lead plaintiff and DMC has shown neither that Carolantic will not fairly and adequately protect the interests of the class nor that Carolantic is subject to unique defenses rendering it atypical, the Carolantic Group will be appointed lead plaintiff.

### B. Appointment of Lead Counsel

■ The PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class," 15 U.S.C. § 78u–4(a)(3)(B)(v), and courts typically do not disturb a lead plaintiff's selection unless it is necessary to protect the interests of the class, *see In re Flight Safety Techs., Inc. Sec. Litig.*, 231 F.R.D. 124, 132 (D.Conn.2005) (citing cases).

Carolantic seeks approval of Scott + Scott, LLC as lead counsel. Scott + Scott is a national law firm with a "significant national practice" in securities litigation and which currently serves as co-lead counsel in at least two securities litigation class actions in this District. *See* Firm Profile [Doc. # 37–3, Ex. D] at 2–3; Carolantic Response Brief at 9. Additionally, because Scott + Scott is Connecticut-based, the need for liaison or local counsel is eliminated, thus alleviating any potential for duplicative billing and other inefficiencies. Further, Carolantic has established a protocol with counsel for the purpose of remaining informed of the progress of the litigation and making decisions concerning the management of the litigation, including a procedure for resolving disputes and arrangements for keeping Carolantic adequately apprised of proceedings and settlement discussions. *See* Declaration of Carolantic Partners, LLC [Doc. # 37–3, Ex. E] at ¶ 5. While there are other factors that the Court could consider if appointment of the lead plaintiff's counsel were challenged, *see In re Cendant Corp.*, 264 F.3d 201, 276 (3d Cir. 2001), that is unnecessary here. Thus, the Court approves Carolantic's selection of Scott + Scott as lead counsel.

### IV. Conclusion

For the foregoing reasons, the Carolantic Group is appointed lead plaintiff and its selection of Scott + Scott, LLC as lead counsel is approved. Thus, Carolantic's motion [Doc. # 37] is GRANTED, and all other motions for appointment of lead plaintiff and counsel [Docs. ## 19, 22, 25, 32, 33, 36, 48] are DENIED.

Pursuant to the Court's Amended Consolidation and Scheduling Order [Doc. # 12],

---

10. *See also, e.g., In re Lernout & Hauspie Sec. Litig.*, 138 F.Supp.2d 39, 45 (D.Mass.2001) (meeting of lead plaintiffs "spawned a relatively detailed litigation strategy ... includ[ing] a method for handling the bankruptcy case being litigated in Belgium and protecting the class interests in the bankruptcy proceedings here. Thus, plaintiffs are no longer a virtual lead plaintiff group operating solely by fax, e-mail, and telephone but have demonstrated an ability to work effectively in person together. They have also agreed to regular conference calls every two weeks"); *Local 144 Nursing Home Pension Fund v. Honeywell Int'l, Inc.* 00–3605(DRD), 2000 WL 33173017, at *4 (D.N.J. Nov. 16, 2000) ("[T]hrough declarations, the Local 144 Group has advised of its sophistication, ability and inclination to actively oversee this litigation. Their declarations describe the past and continued meetings between the institutional investors and outside counsel, the institutional investors' involvement in the litigation thus far, and the fact that the investors chose the outside counsel (not vice versa). Additionally, it appears that a regular meeting schedule has been established, there is a procedure to convene emergency meeting[s], and the Local 144 Group has established a protocol to determine activity in the event that the Group cannot reach a consensus on a particular issue.").

plaintiffs' Consolidated Amended Complaint shall be filed by May 25, 2006. Pursuant to the Court's Supplemental Consolidation and Scheduling Order for the Derivative Litigation [Doc. # 58], derivative plaintiffs shall also file their Consolidated Amended Derivative Complaint by May 25, 2006.

IT IS SO ORDERED.