## In re MILESTONE SCIENTIFIC SECURITIES LITIGATION

No. CIV. A. 98–3404 (AJL).

United States District Court,
D. New Jersey.

Oct. 22, 1998.

Arthur N. Abbey, Jill S. Abrams, Joshua Lifshitz, Abbey, Gardy & Squitieri, LLP, New York City, for Plaintiffs Robert M. Gintel, et al.

Andrew N. Friedman, Mark S. Willis, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, for Plaintiff Dr. Alan Shaw.

Andrew N. Friedman, Mark S. Willis, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Seattle, WA, Newark, NJ, for Plaintiff John Wanda.

Allyn Z. Lite, Joseph J. DePalma, Goldstein Lite & DePalma, Newark, NJ, for Plaintiffs John Wanda, Jeffrey Grau Ira, Candice Zipes, Ram Yariv, Anne D. Shapiro, Nancy Canella, et al.

Peter S. Pearlman, Cohn Lifland Pearlman Herrman & Knopf LLP, Saddle Brook, NJ, Richard D. Bemporad, David C. Harrison, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, for Plaintiffs Laverne Catanzarite and Alexander Weingarten, et al.

Stephen D. Oestreich, Robert C. Finkel, Wolf Popper LLP, New York City, for Plaintiff Laverne Catanzarite.

Klari Neuwelt, Law Office of Klari Neuwelt, New York City, for Plaintiffs Alexander Weingarten, et al.

Arthur N. Abbey, Jill S. Abrams, Joshua Lifshitz, Abbey, Gardy & Squitieri, LLP, New York City, James V. Bashian, Law Offices of James V. Bashian, P.C., Fairfield, NJ, for Plaintiffs Vivian Bollag, et al.

Joel P. Laitman, Schoengold & Sporn, P.C., New York City, for Plaintiffs Candice Zipes, et al.

Leonard Barrack, Daniel E. Bacine, Gerald Rodos, Barrack, Rodos & Bacine, Philadelphia, PA, Samuel R. Simon, Robert A. Hoffman, Barrack, Rodos & Bacine, Haddonfield, NJ, for Plaintiffs John Johnson, et al.

Jonathan M. Plasse, Emily C. Komlossy, Catherine A. Murphy, Goodkind Labaton Rudoff & Surachow, LLP, New York City, Kenneth Elan, Joseph Garland, Law Offices of Kenneth Elan, New York City, for Plaintiffs Ram Yariv, et al.

Peter L. Masnik, Kalikman & Masnik, Haddonfield, NJ, Sherrie Savett, Jacob A. Goldberg, Berger & Montague, P.C., Philadelphia, PA, Bruce Murphy, Vero Beach, FL, Neil Rothstein, David R. Scott, Scott & Scott, LLC, Philadelphia, PA, for Plaintiffs John E. Houx, et al.

Burton H. Finkelstein, Donald J. Enright, Finkelstein, Thompson & Loughran, Washington, D.C., for Plaintiffs Nancy Cannella, et al.

Marc I. Gross, Daniel R. Wotman, Pomerantz Haudek Block & Grossman, New York City, David Jaroslawicz, Jaroslawicz & Jaros, New York City, for Plaintiffs Anne D. Shapiro, et al.

Miles M. Tepper, Law Offices of Miles M. Tepper, West Orange, NJ, Jeffrey H. Squire, Joanne M. Cicala, Kaufman, Malchman, Kirby & Squire, New York City, for Plaintiffs Joseph Shultz, et al.

Gary S. Graifman, Kantrowitz, Goldhamer & Graifman, Chestnut Ridge, NY, Jules Brody, Howard T. Longman, Aaron L. Brody, Tzivia Brody, Stull, Stull & Brody, New York City, for Plaintiffs Neil Chernichaw, et al.

Steven M. Gellerstein, Gellerstein & Saul, Teaneck, NJ, Brian P. Murray, Rabin & Peckel LLP, New York City, Leo W. Desmond, Law Office of Leo W. Desmond, West Palm Beach, FL, for Plaintiff Frank Nesbit, III.

Joseph P. LaSalla, McElroy, Deutsch & Mulvaney, Morristown, NJ, for Plaintiffs Michael Trokel, et al.

Julie L. Friedberg, Berlack Israels & Liberman LLP, Morristown, NJ, Martin S. Siegel, John P. Biederman, Berlack Israels & Liberman LLP, New York City, for All Defendants.

## OPINION

LECHNER, District Judge.

This is an action for securities fraud brought on behalf of shareholders of Milestone Scientific, Inc. ("Milestone"), seeking damages for violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78t(a) and 78j(b), and Rule 10b–5 promulgated thereunder. 17 C.F.R. § 240.10b–5. Jurisdiction is alleged pursuant to 28 U.S.C. § 1331.

Currently pending is a motion (the "Motion") for the appointment of lead plaintiff (the "Lead Plaintiff Motion") and approval of the selection of lead counsel (the "Lead Counsel Motion"), pursuant to § 21D(a)(3) of the Exchange Act, as amended, 15 U.S.C. § 78u–4(a)(3). The Motion was filed by Robert M. Gintel ("Robert Gintel"), Barbara Gintel, Gintel Partners Fund LP, Gintel Ray Ltd. Partnership, Gintel Asset Management Inc., Transaqua L.L.C. and the Gintel Fund (collectively, the "Gintel Group").[1] For the reasons set forth below, the Lead Plaintiff Motion is granted; decision on the Lead Counsel Motion is reserved.[2]

---

[1]. The Motion was jointly filed by the Gintel Group and Dr. Alan Shaw ("Dr. Shaw"). The Motion originally included Dr. Shaw as a proposed Lead Plaintiff. Dr. Shaw, however, filed a Notice of Withdrawal (the "Notice of Withdrawal") removing himself from consideration as Lead Plaintiff. See Notice of Withdrawal. In all other respects, the Motion remains unchanged.

[2]. In support of the Motion, Gintel Group submitted: Motion of the Gintel Group and Dr. Alan

*Background*

A. *Facts*[3]

1. *The Wand*

Milestone is a Delaware corporation with its principal place of business in New Jersey. *See* Complaint at ¶ 10. Milestone develops, manufactures, markets and sells equipment and related disposable or consumable items and products for use primarily by dental practitioners. *See id.* One of the principal products of Milestone is "The Wand", a computer-controlled device used to anaesthetize dental patients. *See id.* Milestone introduced The Wand at the American Dental Association ("ADA") conference on 18 October 1997, and began selling units of The Wand in January 1998. *See id.*

2. *The Statements*

Optimistic statements concerning the test results and growth potential of The Wand were attributed to several of the officers and/or directors of Milestone. Prior to the launching of The Wand, the 1996 Annual Report of Milestone (the "1996 Annual Report") quoted Stanley F. Malamed ("Malamed"), soon-to-be special technology advisor to the president of Milestone, as follows:

> Our primary research and finding ... is that the vast majority of patients tested reported either a 'more comfortable,' or 'less painful' injection experience than any other local anesthetic injection method currently available. In the majority of test cases, the patient described The Wand as 'pain free.'

Complaint at ¶ 28 (quoting 1996 Annual Report). On 11 August 1997, Leonard A. Osser ("Osser"), Chief Executive Officer and Chairman of the Board of Directors of Milestone, stated in a report over the *Business Wire*, a national wire service, that "machine and dis-

posable sales will grow rapidly after the introduction [of The Wand]." *Id.* at ¶ 30.

Milestone similarly promoted The Wand in various publications and press releases. An article published in the *New York State Dental Journal* ("NYSDJ") in August 1997 described a fifty patient clinical study which found a prototype of The Wand to be "two to three times less painful than the manual injection." *Id.* at ¶ 31. The article in the NYSDJ was authored by Mark Hochman ("Hochman"), an assistant professor at the Stony Brook School of Dental Medicine of the University of New York and an associate clinical director of Milestone. *See id.* In October 1997, Hochman and Mark Friedman ("Friedman"), an associate professor at the University of Southern California ("USC") School of Dentistry and clinical director of Milestone, co-authored an article in the *Compendium*, a journal published by the Dental Learning Systems Co. *See id.* at ¶ 35. The article in *The Compendium* similarly "prais[ed] The Wand." *See id.*

A press release issued by Milestone on or about 4 September 1997 announced USC would purchase The Wand (the "USC Purchase") for use by its dental students. *See id.* at ¶ 33. In another press release on 8 October 1997, Milestone reported it had authorized, and obtained commitments from full-service dental dealers Henry Shein Inc., Patterson Dental and American Dental Cooperative (collectively, "Dental Dealers"), to sell The Wand. *Id.* at ¶ 37.

In November 1995, Milestone common stock went public at $4.00 per share. *Id.* at ¶ 5. Immediately upon the announcement of the USC Purchase on 4 September 1997, Milestone common stock rose to $9 1/8 per share. *See id.* at ¶ 34. Subsequent to the announcement on 8 October 1997 that Dental Dealers were committed to selling The

---

Shaw for Appointment as Lead Plaintiffs Pursuant to Section 21(D)(a)(3)(B) of the Securities Exchange Act of 1934, For Approval of Their Choice of Lead Counsel, and for Entry of [Proposed] Pre–Trial Order No. 2; Memorandum of Law in Support of the Motion by the Gintel Group and Dr. Alan Shaw for Appointment of Lead Plaintiff, Approval of Lead Counsel and Entry of [Proposed] Pre–Trial Order No. 2 (the "Moving Brief"); [Proposed] Pre–Trial Order No. 2 (the "Proposed Pre–Trial Order No. 2");

the affidavit of Allyn Z. Lite (the "Lite Aff."); and the affidavit of Jill S. Abrams (the "Abrams Aff."), attaching exhibits A through F.

3. The facts are derived from the class action complaint (the "Complaint") filed prior to consolidation on 19 June 1998, in *Bollag v. Osser et al.*, Civil Action No. 98–2854(AJL), attached as exhibit B to the Abrams Aff.

Wand, Milestone common stock rose to $25 per share on trading volume of more than 600,000 shares. *See id.* at ¶ 38. Milestone common stock traded as high as $27 3/4 per share in the fall of 1997. *Id.* at ¶ 5.

On 3 November 1997, in a report over the *Business Wire,* (the "3 November 1997 Announcement"), Osser stated:

> We are very excited over the reaction of dentists at the ADA conference. It only serves to further our belief in how The Wand will advance the delivery of anesthesia in dentistry. We are very pleased with the amount of orders we have for The Wand so far and expect even more orders in the ensuing months.

*Id.* at ¶ 40 (quoting 3 November 1997 Announcement). On 17 November 1997, Milestone announced over the *Business Wire* its financial results for the third quarter of 1997. The report indicated results for the three months ended 30 September 1997 were $670,896, as compared to $47,471 for the same period the previous year. *See id.* at ¶ 42. Osser was reported as stating:

> As the company that just recently launched The Wand (TM), a revolutionary new approach to giving 'painless' injections in dentistry, the results to date, understandably, do not reflect the tremendous excitement and acceptance that The Wand(TM) has received. We are gratified by the enthusiastic endorsement of The Wand (TM) as evidenced by the 8000 orders valued at $5 million that were booked as a result of the recent American Dental Association convention .... With ramp up of production under way and distribution arrangements in place with the leading distributors of dental equipment and supplies, we are looking forward to broad acceptance and usage of The Wand.

*Id.* In a press release issued on 19 February 1998 (the "19 February 1998 Announcement"), Milestone announced its intention to "increase manufacturing capacity by the third quarter to over 5 million disposables per month. The reaction from dentists using The Wand is overwhelmingly positive." *Id.* at ¶ 44 (quoting 19 February 1998 Announcement).

Also in February 1998, Michael Krochak ("Krochak"), a director of the Dental Phobia Clinic at Mount Sinai Medical Center in New York City, authored an article published in the *Compendium.* The article stated, among other things, The Wand reduced patient anxiety. *See id.* at ¶ 45.

On 30 March 1998, in a report over the *Business Wire,* (the "30 March 1998 Announcement"), Milestone reported:

> The principal reason for ... increase in losses [in the year ended December 31, 1997] were costs associated with research and development in connection with the completion of 'The Wand(TM)', marketing and personnel costs relating to the launch of 'The Wand(TM)'.... After reflecting these losses, Milestone's financial position continues to be strong with more than $15,000,000 in cash, cash equivalents and treasury bills at year-end and virtually no debt.
>
> ...
>
> [F]or the 12 weeks ended March 26, 1998 indicating revenues of more than $5,000,-000 and profitable operations. Milestone has received orders for more than 12,000 units of 'The Wand(TM)' of which 7,011 have been shipped .... Reaction from dentists using 'The Wand(TM)' continues to be overwhelmingly favorable, returns from dealers, to date, have been limited and dealer inventories are low because of strong demand from dentists.
>
> ...
>
> Osser ... stated, 'The Wand's initial results and acceptance by the dental community has been extremely gratifying and in response to increasing demand for disposables the Company has accelerated steps to significantly increase its production capacity .... The continued excitement about The Wand gives us confidence that this revolutionary approach to painless dentistry will be an integral part of the dentist's practice.'

*Id.* at ¶ 48 (quoting 30 March 1998 Announcement).

The 1997 Form 10–K of Milestone, issued on 31 March 1998 (the "1997 10–K of Milestone"), additionally noted:

Three separate additional studies were conducted on various aspects of 'The Wand(TM)' operation. These have been published in major dental publications and have helped establish acceptance and credibility within the dental community.

. . .

During 1996 and 1997, the Company granted stock options to a director and various consultants to purchase 35,000 and 164,000 shares of common stock, respectively, at prices ranging from $5.125 per share to $6.50 per share.

*Id.* at ¶¶ 49, 51 (quoting 1997 10–K of Milestone).

On 4 May 1998, Milestone reported over the *Business Wire* (the "4 May 1998 Announcement"), its results for the first quarter ended 31 March 1998:

Revenues for the three months ended March 31, 1998 were $5,260,149 compared to $760,123 for the same period a year ago. The net income for the first quarter ending March 31, 1998 was $358,079, or $0.04 per share on weighted average shares outstanding of 8,733,373, compared to a loss of $(696,028), or $(0.14) per share on weighted average shares outstanding of 4,840,527 for the comparable period a year earlier. During the first quarter of 1998 the Company delivered 7,311 Wand(TM) system kits to distributors and 817,000 disposable components. This represents net sales of $4,760,069 for the first three months of the fiscal year.

The Company has a number of letters-of-intent from foreign distributors who are interested in bringing The Wand to the European, South American and Pacific Rim markets.

*Id.* at ¶ 54 (quoting 4 May 1998 Announcement).

Following the 3 November 1997 Announcement, the price of·Milestone common stock rose to $27 1/8 per share on trading volume of more than 750,000 shares. *See id.* at ¶ 41. On 7 January 1998, Milestone announced its common stock had been accepted for trading on the NASDAQ. *See id.* at ¶ 43. On 23 April 1998, Milestone common stock began trading on the American Stock Exchange. *See id.* at ¶¶ 11, 53.

On 20 May 1998, it was first reported in the *Bloomberg News* that Milestone had awarded more than 100,000 stock options now worth $1 million to Hochman, Friedman and Krochak, all of whom published articles advocating use of The Wand. *See id.* at ¶ 55. The same article reported Malamed also received stock options. These financial interests of Hochman, Friedman, Krochak and Malamed were not previously disclosed to the public. The *Bloomberg News* also revealed that Melamed advised the USC dean, Howard Landesman, in the fall of 1997, to buy the devices. In addition, Osser was quoted as stating "if someone feels they've been misled, we'll make full disclosure." *See id.* at ¶¶ 57–58.

On 4 June 1998, Herriot Tabuteu ("Tabuteu"), analyst at Nationsbank Montgomery Securities, reduced his estimate for sales of Milestone from $6.2 million to $4.2 million for the second quarter of 1998. Consequently, Tabuteu expected Milestone to report a modest loss for the second quarter of 1998, rather than the profit Tabuteu previously estimated. The revised calculations of Tabuteu incorporated the fact that Henry Shein Inc., the largest distributor of Milestone, reduced purchases of The Wand from 2,600 to 900 for the second quarter of 1998 (the "Shein Reduction"). *See id.* at ¶ 59.

On 5 June 1998, the *New York Post* reported Osser failed to reveal his association with "questionable companies and business associations," namely his prior affiliation with Geri–Care, a company that had been previously sued by the U.S. Government for Medicare fraud. *See id.* at ¶ 60.

On the same day, Milestone stated the Shein Reduction would result in a shortfall of approximately $1.2 million. *Id.* Promptly after this announcement, the price of Milestone common stock plummeted approximately thirty-one percent to $10 1/2 per share before trading was halted. On 5 June 1998, the price Milestone common stock fell an additional sixteen percent to $8 13/16 per

share on trading volume of 1,168,300 shares. *See id.* at 61.

The class action plaintiffs allege that during the class period (the "Class Period"),[4] Milestone and certain of its officers and/or directors failed to disclose the more than 100,000 stock options worth more than $1 million given to Hochman, Friedman and Krochak. *See id.* at ¶¶ 32, 46, 62. It is contended the failure to disclose this information and the receipt of the options rendered the judgment of Hochman, Friedman and Krochak "suspect." *See id.* at ¶¶ 32, 63. The class action plaintiffs attribute the sale of more than 7,000 of The Wands to the public to the reputations of Hochman, Friedman, Krochak and the publishers who advocated use of The Wand. *See id.* at ¶ 62. The Complaint alleges:

> Defendants were aware that on the strength of the articles and research of these authors, dental schools, dentists and distributors would purchase large amounts of The 'Wand.' Defendants were equally aware that once it was disclosed that these same authors and researchers had received stock options from the Company these articles would be viewed as paid for promotional, and the orders and sales for The Wand would fall, as they did.

*Id.* at ¶ 63. In this regard, the class action plaintiffs contend the "demand for The Wand was not as represented by the Company." *See id.* at ¶ 65.

It is additionally alleged certain of the officers and/or directors of Milestone "were privy to confidential and proprietary information concerning Milestone ... [and] knew or recklessly disregarded the fact that the adverse facts ... had not been disclosed to and were being concealed from the public." *Id.* at ¶¶ 7, 19. Specifically, the Complaint alleges the officers and/or directors recklessly disregarded or actively concealed information indicating reactions from dentists to The Wand were not generally favorable. *See id.* at ¶¶ 7, 19, 64. It is alleged, without further explication, the dissatisfaction of the dentists stemmed in large part from the fact that "The Wand did not always achieve anesthesia." *See id.* at ¶ 64. The class action plaintiffs also assert Malamed failed to disclose his receipt of options to acquire 50,000 shares of Milestone common stock. *See id.* at 56.

Notice of the pendency (the "Notice of Pendency")[5] of the class action was published over the *Business Wire* on 17 June 1998 by the law firm of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. on behalf of its client, John Wanda ("Wanda"). *See* Notice of Pendency. The Notice of Pendency provided, in relevant part:

> The complaint [filed by Wanda in the United States District Court for the District of New Jersey] asserts claims under the federal securities laws, including claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Plaintiff seeks to recover losses suffered by investors who bought Milestone Scientific common stock during the Class Period. The lawsuit alleges that MS and certain of its officers and directors engaged in material misrepresentations and omissions during the class period concerning, among other things, that its new product was not meeting with widespread acceptance by dentists but rather that the purported acceptance had been achieved by improper means— the undisclosed payments of stock options worth more than $1 million to researchers to provide glowing testimonials regarding the Company's products .... If you are a member of the Class who purchased Milestone Scientific, Inc. common stock between September 29, 1997 and June 5, 1998 (the "Class Period"), you may move the Court, not later than sixty days from June 17, 1998, to serve as lead plaintiff for the Class.

*See* Notice of Pendency.

### 3. The Gintel Group

On 17 August 1998, the Gintel Group filed the Motion. During the Class Period, the Gintel Group collectively purchased more than 1,400,000 shares of Milestone common

---

4. For purposes of the instant Motion, the Class Period is deemed to run from 31 March 1997 to 5 June 1998. *See* Moving Brief at 1–2 n. 2.

5. The Notice of Pendency is attached as exhibit A to the Abrams Aff.

stock and suffered losses exceeding $11,700,-000. *See* Certifications of Robert M. Gintel and Stephen G. Stavrides, (the "Gintel and Stavrides Certifications"), and accompanying table of purchases ("Table of Purchases").[6]

### B. *Procedural History*

The first complaint was filed by Wanda on 17 June 1998. *See* Notice of Pendency. On the same date, as previously discussed, counsel for Wanda published the Notice of Pendency of the securities class action over the *Business Wire. See id.* Following the publication of the Notice of Pendency, other plaintiffs filed related securities class action complaints alleging similar facts.

Sixteen complaints were filed against Milestone, and certain of its officers and/or directors, Osser, Daniel R. Martin, Michael McGeehan, Thomas M. Stuckey, Gregory Volok, Pat Mele III, Larry Haimovitch, Malamed, Hochman, Friedman and Krochak (collectively, the "Individual Defendants"). By order, dated 17 August 1998, ("Pre–Trial Order No. 1"), the actions were consolidated. *See* Pre–Trial Order No. 1.[7]

On 17 August 1998, the Gintel Group filed the Motion, seeking (1) appointment to serve as Lead Plaintiff in the consolidated action; (2) approval of the selection of Lead Counsel, composed of an executive committee (the "Plaintiffs' Executive Committee") including the law firms of Abbey, Gardy & Squitieri, LLP, and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Schoengold & Sporn, P.C., with Abbey, Gardy & Squitieri, LLP as Chair, and Goldstein Lite & DePalma as liaison counsel ("Liaison Counsel") to represent the consolidated class of plaintiffs (the "Class"); and (3) entry of Proposed Pre–Trial Order No. 2.[8]

### *Discussion*

#### A. *The Private Securities Litigation Reform Act of 1995*

Congress enacted the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, (the "PSLRA") to remedy perceived abuses in the securities class action litigation. *See In re Cendant Corp. Litig.,* 182 F.R.D. 144, 144–145 (D.N.J.1998); *In re Oxford Health Plans, Inc., Secs. Litig.,* 182 F.R.D. 42, 43–44 (S.D.N.Y.1998); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 404–405 (D.Minn. 1998); *Gluck v. Cellstar Corp.,* 976 F.Supp. 542, 543–44 (N.D.Tex.1997); *Lax v. First Merchants Acceptance Corp.,* 1997 WL 461036, at *2 (N.D.Ill. Aug. 11, 1997).

Prior to the enactment of the PSLRA, plaintiffs in securities fraud cases tended to profit irrespective of the culpability of the defendants, most of whom chose settlement over prolonged and expensive litigation. *See Gluck,* 976 F.Supp. at 543–44. These cases were constantly subject to manipulation by lawyers and "professional plaintiffs," whose financial holdings in the defendant issuers were insignificant. *See* Conference Report on Securities Litigation Reform, H.R. Rep. No. 369, 104th Congress, 1st Sess. 31, *reprinted in* 1995 U.S.C.C.A.N. 679, 730–34 (the "Conference Report"). Often controlling the securities class actions, these plaintiffs and lawyers reaped huge profits, to the detriment of shareholders with more significant financial holdings. *See id; see also Cendant,* 182 F.R.D. at 144–145; *D'Hondt v. Digi Int'l Inc.,* 1997 WL 405668, at *2 (D.Minn. Apr. 3, 1997).

The purpose behind the PSLRA is to " 'empower investors so that they, not their lawyers, control private securities litigation' by allowing the Court to ensure the transfer

---

**6.** The Gintel and Stavrides Certifications and Table of Purchases are attached as exhibit C to the Abrams Aff.

**7.** The actions consolidated by Pre–Trial Order No. 1 were brought by John Wanda (98–2853), Laverne Catanzarite (98–2866), Vivian Bollag and Israel Bollag (98–2854), Alexander Weingarten and Sidney Weingarten (98–2876), Jeffrey Grau Ira (98–2885), Candice Zipes (98–2973), John Johnson (98–2956), John E. Houx (98–3081), Ram Yariv (98–3403), Ann D. Shapiro (98–3404), Joseph Shultz (98–3256), Nancy Can-

nella (98–3118), Neil Chernichaw (98–3280), Michael Trokel, Frank Nesbit III, and Julius Rivera and Rosa Rivera (98–3780).

**8.** Proposed Pre–Trial Order No. 2, *inter alia,* sets forth the appointment and organization of Lead Plaintiff and Lead Counsel, directs the filing of a consolidated and amended class action complaint to supercede any complaints previously filed in the actions consolidated hereunder, and orders the preservation of documents. *See* Proposed Pre–Trial Order No. 2.

of 'primary control of private securities litigation from lawyers to investors.' " *See Chill,* 181 F.R.D. at 407 (quoting Conference Report at 683, 685); *Gluck,* 976 F.Supp. at 546.

Specifically, the PSLRA provides a method for identifying the plaintiff or plaintiffs who are the most strongly aligned with the class of shareholders, and most capable of controlling the selection and actions of counsel. *See* Conference Report at 371; *see also Fischler v. AmSouth Bancorp.,* 1997 WL 118429, at *1 (M.D.Fla. Feb. 6, 1997). In so providing, the PSLRA attempts to replace the outdated practice of selecting representative plaintiffs by a "race to the courthouse," with a selection system which focuses on the adequacy of the representative. *See* Conference Report at 689; *see also Cendant,* 182 F.R.D. at 144–145; *Ravens v. Iftikar,* 174 F.R.D. 651, 654 (N.D.Cal.1997).[9]

The PSLRA added to the Exchange Act § 21D ("Section 21D"), as amended, 15 U.S.C. § 78u–4. Section 21D sets forth procedures for early notification to potential class members of the filing of the class action. Under section 21D(a)(3), a plaintiff seeking to represent a class:

> Shall cause to be published in a widely-circulated national business-oriented publication or wire service, a notice advising members of the purported class-
>
> > (I) of the pendency of the action, the claims asserted therein, and the purported class period;
> >
> > (II) *that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the Court to serve as lead plaintiff of the purported class.*

15 U.S.C. § 78u–4(a)(3)(A)(i)(emphasis added).

The PSLRA also altered the procedure by which the lead plaintiff for the purported class is appointed. As stated, pursuant to the PSLRA, the plaintiff who is "first to file"

is no longer assured of the lead plaintiff position. Section 21D(a)(3)(B)(i) provides:

> Not later than 90 days after the date on which a notice is published ... the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and *shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members* ....

15 U.S.C. § 78u–4(a)(3)(B)(i)(emphasis added). In eschewing the "first come, first serve" determination of the lead plaintiff in favor of the most adequate plaintiff, the PSLRA "ensure[s] that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers." *See In re Donnkenny Inc. Secs. Litig.,* 171 F.R.D. 156, 157 (S.D.N.Y.1997)(citing Conference Report at 730–34).

The selection of the most adequate plaintiff under the PSLRA is governed by a rebuttable presumption:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that-
>
> > (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
> >
> > (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> >
> > (cc) otherwise satisfies the requirement of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

> This presumption of adequacy
>
> *may be rebutted only upon proof by a member of the purported plaintiff class*

---

9. The PSLRA did not completely eliminate the "race to the courthouse," however. As detailed below, plaintiffs who are first to file suit are obligated to provide notice to other purported class members of the asserted claims and the purported class period. *See* 15 U.S.C. § 78u–4(a)(3)(A). Plaintiffs who are first to file, moreover, are in a better position to aggregate plaintiffs in an effort to obtain the largest financial interest in the litigation, an important aspect of lead plaintiff status.

*that the presumptively most adequate plaintiff-*

(aa) will not fairly and adequately protect the interest of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(emphasis added).

The PSLRA further provides that once the most adequate plaintiff is selected, the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." Title 15 U.S.C. § 78u–4(a)(3)(B)(v).

### B. Appointment of Lead Plaintiff

#### 1. The Notification Requirement

■ The Gintel Group is presumptively the most adequate plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). The notification requirement of the PSLRA has been met and the Gintel Group has timely moved to be appointed Lead Plaintiff. There is no dispute that the Gintel Group filed "a motion in response to a notice under subparagraph (A)(i)." *See* 15 U.S.C. § 78u–4 (a)(3)(B)(iii)(I)(aa). Pursuant to Section 21D(a)(3)(A)(i), Wanda published the Notice of Pendency in a widely-circulated national business-oriented wire service, the *Business Wire*.[10] The Notice of Pendency adequately apprised members of the Class of their right to move the Court to serve as lead plaintiff or plaintiffs no later than sixty days from the date of publication. *See* Notice of Pendency. In response to the Notice of Pendency, the Gintel Group filed the Motion, as required under Section 21D(a)(3)(B)(II)(aa).

A motion for the appointment of lead plaintiff must be filed within sixty days of the publication of the Notice of Pendency. *See* 15 U.S.C. § 78u–4(a)(3)(A)(i). There is no dispute about the timeliness of the Motion made in response to the Notice of Pendency. The Notice of Pendency was published on 17 June 1998. *See* Notice of Pendency. The Motion was filed on 17 August 1998.

#### 2. The Largest Financial Interest Requirement

■ It appears the Gintel Group has the largest financial interest of any class member. As discussed, a presumption of adequacy arises where the "group of persons" having the largest financial interest among the named plaintiffs in the class action seeks appointment as lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb). The PSLRA does not define "largest financial interest" or provide guidance as to how such a determination is made. One district court has found four factors "surely relevant" to this inquiry:

(1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs.

*First Merchants Acceptance Corp.*, 1997 WL 461036, at *5; *see also In re Olsten Corp. Secs. Litig.*, 3 F.Supp.2d 286, 295 (E.D.N.Y.1998)(recognizing same four factors).

During the Class Period, the Gintel Group purchased 1,412,200 shares of Milestone common stock. *See* Gintel and Stavrides Certifications and Table Of Purchases.[11] Collec-

---

**10.** The PSLRA does not define "widely-circulated" or "wire service." *See* 15 U.S.C. § 78u–4(a)(3)(A)(i). Congress, however, intended publication to "encompass a variety of mediums, [sic] including wire, electronic, or computer services." *See* Conference Report at 733; *see also Greebel v. FTP Software, Inc.*, 939 F.Supp. 57, 62 (D.Mass.1996). The *Business Wire* is a business-oriented wire service within the meaning of the PSLRA. *See Greebel*, 939 F.Supp. at 62 ("[T]he mere fact that *Business Wire* arrives at a print publication via an electronic signal, rather than in the manner of a traditional wire service, does not disqualify it as a 'wire service' within the meaning of the statute."). Additionally, the *Busi-*

*ness Wire* is subscribed to by "hundreds of print publications and wire services, encompassing news media in all fifty states," and is thus "widely-circulated". *See id.; First Merchants Acceptance Corp.*, 1997 WL 461036, at *4 ("[T]he court must make its own interpretation as to what the term ['widely-circulated'] means.").

**11.** For purposes of the Motion, the figures and calculations set forth in exhibits C, D and E of the Abrams Aff. are accepted as accurate.

Section 21D(e)(3) provides a formula for computing damages of a class member for violations of Section 10(b). Different calculations apply to

tively, the Gintel Group suffered losses of $11,789,419.94. *See id.*[12]

Also relevant in this action are the combined purchases and losses of plaintiffs who support the Motion. The Motion is supported by class action plaintiffs in fourteen of the sixteen originally filed pending actions. The certifications of the shareholders supporting the Motion, (the "Certifications of Class Action Plaintiffs"), represent these plaintiffs collectively purchased 433,035 shares of Milestone common stock and suffered $3,863,599.23 in losses. *See* Certifications of Class Action Plaintiffs.[13] Moreover, no opposition to the Motion has been filed. The presumption has not been rebutted. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II); *see also Zuckerman v. Foxmeyer Health Corp.,* 1997 WL 314422, at *2 (N.D.Tex. Mar. 28, 1997)(where no purported class member presented evidence to rebut statutory presumption, movants were appointed lead plaintiffs). Accordingly, these undisputed figures indicate the Gintel Group has the largest financial interest in the litigation.

### 3. *Rule 23 Requirements*

■ The Gintel Group appears to "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure [ ('Rule 23') ]". *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc); *see also Chill,* 181 F.R.D. at 408 ("Ultimately, the PSLRA channels the concern, as to the adequacy of representation, through Rule 23."). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defense of the representative parties are typical of the claims or defens-

es of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

"A wide-ranging analysis under Rule 23 is not appropriate [at this initial stage of the litigation] and should be left for consideration of a motion for class certification." *Fischler,* 1997 WL 118429, at *2; *see also Gluck,* 976 F.Supp. at 546 ("Evidence regarding the requirements of Rule 23 will of course, be heard in full at the class certification hearing. There is no need to require anything more than preliminary showing at this stage.").

■ Accordingly, "discovery regarding the[ ] elements [of Rule 23] is only allowe[d] if another purported member of the class can demonstrate a reasonable basis for finding the presumptively most adequate plaintiff incapable of adequately representing the class." *See Gluck,* 976 F.Supp. at 546 (citing 15 U.S.C. § 78u–4(a)(3)(B)(iv)). In the instant case, the Motion is unopposed. Moreover, as mentioned, fourteen of the sixteen class action plaintiffs filed certifications in support of the appointment of the Gintel Group as Lead Plaintiff. *See* Certifications of Class Action Plaintiffs. Discovery regarding the satisfaction of the elements of Rule 23, therefore, is not warranted. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iv).

A fact-specific inquiry is nonetheless necessary under Rule 23 to determine whether the presumptively most adequate plaintiff will nevertheless betray the interests of the class. *See Chill,* 181 F.R.D. at 408–409; *In re Ford Motor Co. Bronco II Product Liability Litig.,* 177 F.R.D. 360, 367 (E.D.La.1997). The inquiry should "focus[ ] on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4), that is typicality and adequacy." *Gluck,* 976 F.Supp. at 546.[14]

---

securities that have been sold and securities that are still held.

**12.** The financial interest of the Gintel Group greatly exceeds that of Dr. Shaw, who, as mentioned, withdrew from consideration as Lead Plaintiff. *See* Shaw Certification (stating Dr. Shaw purchased 183,500 shares of Milestone common stock during the Class Period, and suffered losses of $3,224,655.90). The withdrawal

of Dr. Shaw notwithstanding, it appears the Gintel Group retains the largest financial interest.

**13.** The Certifications of Class Action Plaintiffs are attached as exhibit E to the Abrams Aff.

**14.** A defendant or defendants may not object to the adequacy or typicality of the proposed lead plaintiff at this preliminary stage of the litigation. *See Gluck,* 976 F.Supp. at 550 ("Defendants have

■ The Gintel Group has sufficiently demonstrated, at this preliminary stage, the requisite typicality and adequacy. The typicality requirement under Rule 23(a)(3)

> permits the court to assess whether the class representatives themselves present those common issues of law and fact that justify class treatment, thereby tending to assure that the absent class members will be adequately represented.

*Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985); *see General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *In re Prudential Ins. Co. of America Sales Practices Litig.,* 148 F.3d 283, 311 (3d Cir.1998); *Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994). This requirement ensures alignment of the interests of the Class with those of the class representatives "so that the [class representatives] will work to benefit the entire class through the pursuit of their own goals." *In re Prudential,* 148 F.3d at 311; *see Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 631 (3d Cir.), *aff'd, Amchem Products, Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996); *Baby Neal,* 43 F.3d at 57.

■ Rule 23(a)(3) does not require the claims of the Gintel Group be identical to those of the class. *See In re Prudential,* 148 F.3d at 311; *Eisenberg,* 766 F.2d at 786; *Weiss v. York Hospital,* 745 F.2d 786, 809 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *Easton & Co. v. Mutual Benefit Life Ins. Co.,* 1993 WL 89146, at *3 (D.N.J. Feb. 9, 1993). Instead, the typicality requirement is satisfied when the "plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *See Baby Neal,* 43 F.3d at 58; *Eisenberg,* 766 F.2d at 786. The typicality requirement is not met, however, where the "'plaintiff's factual or legal stance is not characteristic of that of other class members.'" *Gunter v. Ridgewood Energy Corp.,* 164 F.R.D. 391, 395 (D.N.J.1996)(quoting *Weiss,* 745 F.2d at 808).

It appears the claims of the Gintel Group are typical of the class. The Gintel Group contends it suffered losses similar to those of the other class members; their losses allegedly result from the common course of conduct of Milestone. *See Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912, 923 (3d Cir.1992)(quoting *Grasty v. Amalgamated Clothing & Textile Workers Union,* 828 F.2d 123 (3d Cir.), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988))("'factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members.'"); *see also In re Prudential,* 148 F.3d at 311; *Baby Neal,* 43 F.3d at 56; *Easton & Co. v. Mutual Benefit Life Ins. Co.,* 1993 WL 89146, at *3 (D.N.J. Feb. 9, 1993).

The Complaint contains allegations and a recitation of facts which are similar, if not identical, to other class action complaints filed prior to consolidation. *Compare, e.g.,* Complaint *with* complaint in *Rivera v. Milestone et al.,* Civil Action No. 98–3780(AJL). The claims and legal theories of the Gintel Group are not so "markedly different" from those of other class members, so as to render them atypical. *See Eisenberg,* 766 F.2d at 786 (citing *Weiss,* 745 F.2d at 809 n. 36).

The different class periods alleged in the various complaints also do not preclude a

---

no standing to oppose the appointment of Lead Plaintiff at this stage of the litigation."); *see also Zuckerman,* 1997 WL 314422, at *2; *Greebel,* 939 F.Supp. at 60–61. "The statute is clear that only potential plaintiffs may be heard regarding appointment of a Lead Plaintiff." *Gluck,* 976 F.Supp. at 550. The PSLRA specifically provides "the court shall consider *any motion made by a purported class member*" in determining the adequacy of a proposed lead plaintiff. *See* 15 U.S.C. § 78u –4(a)(3)(B)(i)(emphasis added); *see also* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(The presumption described in [15 U.S.C. § 78u–4(a)(3)(B)(iii)(I) ] may be rebutted only upon "proof by *a member of the purported plaintiff class* ....")(emphasis added).

However, the determination that the Gintel Group meets the requirements of Rule 23 does not preclude the possibility of revisiting the issue at the class certification stage. The opportunity for Milestone and/or the Individual Defendants to contest class certification on these grounds is preserved. *See Zuckerman,* 1997 WL 314422, at *2; *Gluck,* 976 F.Supp. at 547 (quoting *Greebel,* 939 F.Supp. 57, 60–61 (D.Mass.1996)); *In re Cephalon Secs. Litig.,* 1996 WL 515203 (E.D.Pa. Aug. 27, 1996).

finding of typicality. When the complaints are all based upon a common course of conduct, namely the alleged misrepresentations and omissions of Milestone and its officers and/or directors, the varying class periods may be harmonized.

■ Similarly, the adequacy of representation is not in issue. In this Circuit, the adequacy of the class representative depends on the following two factors:

> (1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to the class.

*Weiss,* 745 F.2d at 811; *see In re Prudential,* 148 F.3d at 312; *Amchem Products, Inc.,* 83 F.3d at 630; *In re General Motors Corp.,* 55 F.3d 768, 800 (3d Cir.1995); *Hoxworth,* 980 F.2d at 923.

■ Adequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action.

It appears the Gintel Group does not have interests antagonistic to the Class. Indeed, the Gintel Group has the largest financial interest, having purchased 1,412,200 shares of Milestone common stock and suffered losses of approximately $11,800,000. *See* Gintel and Stavrides Certifications and Table of Purchases. This financial stake in the litigation provides an adequate incentive for the Gintel Group to vigorously prosecute the action. *See Cendant,* 182 F.R.D. at 147–148 (where potential lead plaintiffs had "suffered enormous losses[,][i]t is unrealistic to assume that they would not travel every avenue that

could potentially enhance their potential recovery.").

Irrespective of the amount of money at stake, it appears the interest of the Gintel Group in the litigation is similar, if not identical, to that of the Class. The investments of the Gintel Group were in the same types of securities as those of the Class—Milestone common stock. *See Eisenberg,* 766 F.2d at 786; *First Merchants Acceptance Corp.,* 1997 WL 461036, at *6–7 (small differences in types of investments does not render plaintiff atypical or inadequate.)

The goals of the Gintel Group in pursuing the litigation against Milestone and the Individual Defendants also do not diverge from those of the Class. In fact, as mentioned, fourteen of the sixteen class action plaintiffs support the Motion. *See* Certifications of Class Action Plaintiffs.

Additionally, Robert Gintel, in his capacity as chairman of the board, Chief Executive Officer and director of the Gintel Fund, an "open-end no load mutual fund," *see* Moving Brief at 9–10, has had experience as a fiduciary. *See Gluck,* 976 F.Supp. at 546; *In re California Micro Devices Secs. Litig.,* 168 F.R.D. 276, 278 (N.D.Cal.1996)(fiduciary capacity relevant to determination of adequacy). Robert Gintel's ties with the Gintel Fund suggest a background in investing which will enable the Gintel Group to protect the interests of the Class. The Gintel Group, possessing interests closely aligned with the Class, is an adequate representative of the Class.[15]

### 4. *Presumption Not Rebutted*

The presumption of adequacy has not been rebutted. As observed, the presumption may be overcome by showing the Gintel

---

15. At this preliminary stage, an examination of the remaining requirements of Rule 23 is not necessary. *See In re Oxford Health Plans, Inc. Secs. Litig.,* 182 F.R.D. 42, 49 (S.D.N.Y. July 15, 1998)("Typicality and adequacy of representation are the only provisions relevant to a determination of lead plaintiff under the PSLRA."); *Olsten,* 3 F.Supp.2d at 296 ("[T]he court need only consider whether [potential lead plaintiffs] meet[] the typicality and adequacy standard of Rule 23."); *Fischler,* 1997 WL 118429, at *2; *Gluck,* 976 F.Supp. at 546.

In any event, it appears, at this stage, the requirements of numerosity and common questions of law or fact are satisfied. *See* Fed. R.Civ.P. 23(a). Millions of shares were sold to thousands of investors. Additionally, it appears the alleged misrepresentations and omissions arose as a result of the alleged common course of conduct of Milestone and its officers or directors or representatives. The alleged misstatements are contained in common documents, including SEC filings and press releases to the investing public.

Group will not "fairly and adequately protect the interest of the [C]lass," or is "subject to unique defenses that render [the Gintel Group] incapable of adequately representing the Class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

As discussed, in the instant action, the adequacy of the Gintel Group has not been challenged. Absent such a challenge, the presumption of adequacy survives. *See Zuckerman,* 1997 WL 314422, at *2 (where "[n]o purported class member has presented evidence to rebut this presumption, ... the Court will appoint the movants as lead plaintiffs"); *D'Hondt,* 1997 WL 405668, at *4 (in delegating the rebuttal of the presumption to members of the putative class, "Congress placed the principal responsibility, for investigating the propriety of any proposed Lead Plaintiff, to the purported class members"); *Gluck,* 976 F.Supp. at 547. Additionally, as mentioned, the Motion is supported by fourteen of the sixteen class action plaintiffs. *See* Certifications of Class Action Plaintiffs.

### 5. *Propriety of Multiple Lead Plaintiffs*

■ The fact that a group, as opposed to a single individual, is proposed as lead plaintiff does not necessarily render the Gintel Group inadequate. The PSLRA expressly provides a "group of plaintiffs" may be deemed most adequate plaintiffs. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). It has also been held that the appointment of more than one lead plaintiff does not violate the PSLRA. *See Oxford,* 182 F.R.D. at 46–47; *In re Cephalon Secs. Litig.,* 1996 WL 515203, at *1 (E.D.Pa. Aug. 27, 1996).

While the PSLRA does not limit the number of proposed lead plaintiffs, a "rule of reason prevails." *See Chill,* 181 F.R.D. at 409.

> The assertion can legitimately be made that the larger the number of proposed Lead Plaintiffs, the greater the dilution of the control that those Plaintiffs can maintain over the conduct of the putative class action ....

*D'Hondt,* 1997 WL 405668, at *3. The inevitable dilution of control stemming from the appointment of multiple lead plaintiffs may result in weakened bargaining power of the lead plaintiffs. In particular, multiple lead plaintiffs may be hampered in their collective ability to effectively negotiate retention agreements and supervise the conduct of counsel. *See Cendant,* 182 F.R.D. at 147 ("[R]epresentation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation."). In this regard, the appointment of multiple lead plaintiffs may

> detract from the [PSLRA's] fundamental goal of client control, as it would inevitably delegate more control and responsibility to the lawyers for the class and make the class representative more reliant on the lawyers.

*Gluck,* 976 F.Supp. at 549–50; *see Steiner v. Frankino,* No. 1:98 CV 0264, slip op. at 12 (N.D.Ohio July 16, 1998); *Donnkenny,* 171 F.R.D. at 157–58.

■ One court, in appointing co-lead plaintiffs, reasoned that multiple lead plaintiffs allows for "diverse representation." *See Oxford,* 182 F.R.D. at 49. Diverse representation is, however, an insufficient rationale justifying the appointment of multiple lead plaintiffs. *See Cendant,* 182 F.R.D. at 148 (rejecting "the argument that additional plaintiffs bring to the litigation other counsel capable of advancing additional funds" as a basis for appointing multiple lead plaintiffs). Focusing on considerations such as diverse representation and additional financing overlooks the fundamental goal of the PSLRA, that of empowering a unified force to control the litigation. *See* Conference Report at 683, 685; *Gluck,* 976 F.Supp. at 549–50.

Where multiple lead plaintiffs have divergent interests, the leadership of a class may be divided, and rendered factious. While the PSLRA refers to "a person or group of persons" as capable of serving as the lead plaintiff, the surrounding statutory language forecloses the appointment of multiple groups or multiple persons not part of a cohesive group. Significantly, apart from the sole reference to a "group of persons," the PSLRA is worded in the singular, providing a mechanism for the appointment of "the most adequate *plaintiff,*" not the most ade-

quate plaintiffs. *See* 15 U.S.C. § 78u–4(a)(3)(B)(i) and (iii).

When considering the Lead Plaintiff Motion, the policies behind the PSLRA must be recognized. The composition of the proposed Lead Plaintiffs must be scrutinized carefully.

In this action, the Gintel Group is proposed as Lead Plaintiff. As mentioned, the Gintel Group consists of Robert Gintel, Barbara Gintel, Gintel Partners Fund LP, Gintel Ray Ltd. Partnership, Gintel Asset Management Inc., Transaqua L.L.C. and the Gintel Fund. *See* Moving Brief at 9. The Gintel Group identified Robert Gintel as the "voice of the Gintel Group which will act as a single [L]ead [P]laintiff." *See id.* at 10. In particular, it appears Robert Gintel "owns, controls and/or has final decision-making authority" in the concerns which compose the Gintel Group. *See id.* at 9. Robert Gintel owns and is one of two limited partners of Gintel Equity Management LLC, which is the general partner of Gintel Partners Fund LP. Robert Gintel also is chairman of the board, Chief Executive Officer and director of the Gintel Fund. *See id.* at 9–10.

Where the interests of proposed lead plaintiffs are aligned, concerns regarding the division of authority and dilution of control are not paramount. It appears Robert Gintel, the single, dominant voice of the Gintel Group, has the same stake in the litigation as the other members and entities comprising the Gintel Group. The dominance of Robert Gintel ensures the alignment of interests among the Gintel Group. In this case, the "group" serves the same statutory purpose as a "person"—the Gintel Group provides a cohesive unit capable of unified decision-making.

It additionally appears the dominance of Robert Gintel will effectively preclude dilution of control over the prosecution of the class action. Moreover, the investment experience of Robert Gintel, and the financial stake of the Gintel Group in the litigation, enable the Gintel Group to withstand any usurpation of control by counsel. The appointment of the Gintel Group as Lead Plaintiff ensures the interests of the Class will be adequately represented.

## C. *Appointment of Lead Counsel*

■ As discussed, the Gintel Group, as the "most adequate plaintiff," may select counsel to represent the Class, subject to the approval of the court. *See* 15 U.S.C. § 78u–4(a)(3)(B)(v). In most securities fraud actions, the related issues of the selection of lead plaintiff and lead counsel are decided concurrently. *See Zuckerman,* 1997 WL 314422, at *2; *Fischler,* 1997 WL 118429, at *1. However, the approval of lead counsel is not governed by the same statutory guidelines which control the lead plaintiff determination. *See Cendant,* 182 F.R.D. at 148 (stating lead plaintiff does not come "inextricably tied to its counsel"). The selection of lead counsel, by contrast, is "subject to [the court's] discretionary judgment that lead plaintiff's choice of representative best suits the needs of the class." *Id.* at 149. The legislative history of the PSLRA reveals that Congress wished to protect and encourage the exercise of discretion.

> [Congress] does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

Conference Report at 35. In the instant action, the approval of Lead Counsel is reserved, pending receipt of a more thorough briefing on the facts and law supporting Lead Counsel, as proposed.

The potential for duplicative services and the concomitant increase in attorneys' fees works against the approval of multiple lead counsel. *See Chill,* 181 F.R.D. at 413 (the structure of proposed leadership should not be "too distended to efficiently manage the prosecution of th[e] action"). In this connection, the "litigation by committee" approach to securities class actions may prove unnecessary and wasteful.

> 'Because the appointment of committees of counsel can lead to substantially increased costs, they should not be made unless needed; a need is most likely to exist in cases in which the interests and positions of group members are sufficiently dissimilar to justify giving them representation in decision making .... Great care must be

taken, however, to avoid unnecessary duplication of efforts and to control fees and expenses.'

*Id.* (quoting Manual for Complex Litigation 3rd § 20.221, at 27–28).

The express limitation in the PSLRA of total attorneys' fees to "a reasonable percentage of the amount of damages and prejudgment interest actually paid to the class," *see* 15 U.S.C. § 78u–4(a)(6), does nothing to assuage concern about multiple counsel. This provision does not guarantee the reasonableness of fees or the non-duplication of services. Moreover, "a court's expertise is rarely at its most formidable in the evaluation of counsel fees." *Cendant,* 182 F.R.D. at 150.

The Gintel Group has retained Abbey, Gardy & Squitieri, LLP, Cohen Milstein Hausfeld and Toll, P.L.L.C., and Schoengold & Sporn, P.C. to comprise the Plaintiffs' Executive Committee. The Gintel Group proposes Abbey, Gardy & Squitieri as Chair ("Chair") of the Plaintiffs' Executive Committee, and Goldstein, Lite & DePalma as Liaison Counsel. As mentioned, there were sixteen actions originally filed against Milestone, which were subsequently consolidated. *See* Pre–Trial Order No. 1. These class action plaintiffs are represented by approximately twenty-seven law firms and individual practitioners.

At this stage, the Gintel Group has not demonstrated sufficient need justifying the approval of multiple lead counsel. In fact, it initially appears the structure of leadership proposed by the Gintel Group will not promote the efficient prosecution of the class action. Specifically, the Gintel Group has not demonstrated sufficient need for the appointment of Liaison Counsel, whose proposed functions appear to be coextensive with those of the Chair and Plaintiffs' Executive Committee. *See* Proposed Pre–Trial Order No. 2;[16] *see also Cendant,* 182 F.R.D. at 152 ("Qualified lead counsel will surely be capable of performing the[] ministerial tasks of [Liaison Counsel]."). Additionally, the Gintel Group has not delineated any specific responsibilities for the Plaintiffs' Executive Committee.[17] The Gintel Group has not shown how the benefits derived from appointing multiple lead counsel outweigh the complications and increased costs and expenses associated with the "litigation by committee" approach.

The Gintel Group is directed to re-brief the issue of the propriety of multiple lead counsel. Specifically, the Gintel Group must proffer sufficient justification, factual and legal, for the approval of multiple lead counsel, including the Plaintiffs' Executive Committee and Liaison Counsel. In addition, the Securities Exchange Commission will be invited to submit a brief concerning the appropriateness of multiple lead counsel in a securities fraud class action. The Gintel Group's brief on this issue is due by the close of business 20 November 1998.

*Conclusion*

For the foregoing reasons, the Lead Plaintiff Motion is granted. Decision on the Lead Counsel Motion is reserved.

---

**16.** As indicated, the proposed roles of Liaison Counsel are as follows:

(C) Plaintiffs' Liaison Counsel shall be responsible for communicating with the Court in coordinate the conduct of the litigation, including the receipt and dissemination of Court orders and notices.

(E) No motion, request for discovery on other retrial proceeding shall be initiated or filed by any plaintiff except through the Chair and *signed by Liaison Counsel* after consultation with the Executive Committee.

Proposed Pre–Trial Order No. 2 (emphasis added).

**17.** The proposed roles of the Plaintiff's Executive Committee are set forth in Proposed Pre–Trial Order No. 2. It provides, *inter alia,*

(C) The Chair ... *after consultation with the Executive Committee,* shall be responsible for coordinating and organizing plaintiffs in the conduct of this litigation, shall be the spokesperson for plaintiffs' counsel ... and shall attend all court hearings and be the contact person for all plaintiffs' counsel.

*See* Proposed Pre–Trial Order No. 2 (emphasis added).